Paul **KALMANOVITZ**, individually and as a shareholder of Pabst Brewing Company, and S & P Company, a California corporation, Plaintiffs,

v.

**G. HEILEMAN BREWING COMPANY, INC.,** a Wisconsin corporation, Russell G. Cleary, HBC Acquisition, Inc., a Delaware corporation, Pabst Brewing Company, a Delaware corporation, William F. Smith, Jr., Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay, Defendants.

Paul **KALMANOVITZ,** an individual, and S & P Company, a California corporation, Plaintiffs,

v.

Irwin **JACOBS,** an individual, Dennis Mathisen, an individual, Gerald A. Schwalbach, an individual, and Daniel T. Lindsay, an individual, Defendants.

Civ. A. No. 82–797.

United States District Court, D. Delaware.

Nov. 21, 1983.

Robert K. Payson and Peter M. Sieglaff of Potter, Anderson & Corroon, Wilmington, Del., and Joseph L. Alioto, Joseph M. Alioto, John I. Alioto, and Gary D. Elion of Alioto & Alioto, San Francisco, Cal., for plaintiffs.

R. Franklin Balotti of Richards, Layton & Finger, Wilmington, Del., and Harry Davidow of Weil, Gotshal & Manges, New York City, for defendants Irwin L. Jacobs, Dennis M. Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay.

Bruce M. Stargatt of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Maurice J. McSweeney of Foley & Lardner, Milwaukee, Wis., and Leslie C. Smith of Foley, Lardner, Hollabaugh & Jacobs, Washington, D.C., for defendants G. Heileman Brewing Co., Inc., Russell G. Cleary, and HBC Acquisition, Inc.

A. Gilchrist Sparks, III and Thomas C. Grimm of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Willis B. Snell of Sutherland, Asbill & Brennan, Washington, D.C., for defendants Pabst Brewing Co. and William F. Smith, Jr.

## OPINION

LATCHUM, Chief Judge.

One year ago this Court was faced with a swirl of litigation arising out of an intense fight for control of Pabst Brewing Company ("Pabst"), a Delaware corporation with its principal place of business in Milwaukee, Wisconsin. Now that the fight for control has been resolved, the Court is again faced with litigation which contends that the activity of some of the participants in the Pabst Beer struggle violated the federal securities and antitrust laws as well as certain state tort and contract laws.

This litigation originally consisted of three separate lawsuits. Initially, the plaintiffs, Paul Kalmanovitz, a citizen of California and shareholder of Pabst, and S & P Co., a California corporation wholly owned by Kalmanovitz, brought suit alleging violations of the federal securities and antitrust laws and the Delaware corporate law in this Court ("Delaware action") against G. Heileman Brewing Company, Inc. ("Heileman"), a Wisconsin corporation with its principal place of business in La Crosse, Wisconsin, Russell G. Cleary, Chief

Executive Officer of Heileman, HBC Acquisition, Inc. ("HBC"), a wholly-owned subsidiary of Heileman incorporated in Delaware, Pabst, and William Smith, President and Director of Pabst. (Docket Item ["D.I."] 1.)[1] Subsequently, Kalmanovitz, individually and as a Pabst shareholder, filed a second suit in the United States District Court for the Northern District of California (the "California federal court") alleging violations of the federal antitrust laws and the California tortious interference with contract law against the same parties named in the original Delaware action and also against additional defendants, Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach, and Daniel I. Lindsay ("the Jacobs Group"), the latter of whom are citizens of Minnesota. (D.I. 41.)[2] Almost immediately thereafter, Kalmanovitz and S & P Co., brought a third action in the California state court against the Jacobs Group alleging breach of contract. (D.I. 71, Ex. A.)[3] This latter case was then removed to the California federal court. (D.I. 71.)

On April 26, 1983, Judge Patel of the California federal court ordered the two California cases to be consolidated and transferred here. (D.I. 70.) Consequently, this Court has before it consolidated in one piece of litigation the two transferred California cases plus the original Delaware action.

Pending before the Court are three motions. First, defendants Heileman, Cleary, HBC, Pabst, and Smith have moved: (a) to dismiss or, in the alternative, to grant summary judgment on plaintiffs' antitrust claims; and (b) to grant summary judgment on Kalmanovitz's claim of tortious interference with contract or prospective advantage. (D.I. 119.) The Jacobs Group also has moved to dismiss plaintiffs' antitrust claims.[4] (D.I. 116.) Kalmanovitz and S & P seek a partial summary judgment on the issue of liability on its breach of contract claim against the Jacobs Group. (D.I. 126.)

## FACTS

This Court in prior opinions has already recited extensively the various facts and maneuvers relating to the attempts to gain control of Pabst,[5] and will therefore limit discussion of the facts to those which are pertinent to the pending motions.

The relevant facts begin on October 26, 1982, when Paul Kalmanovitz and the Jacobs Group entered into a written Memorandum of Terms (D.I. 121, Ex. 1), "whereby they would make a public tender offer for 3,000,000 shares of Pabst stock." (D.I. 41 at 5.) The Jacobs Group already owned 1,140,305 shares[6] of Pabst stock and when combined with the three million shares of their tender offer would give them a majority of the outstanding Pabst stock.

1. *Kalmanovitz v. G. Heileman Brewing Co., Inc.,* C.A. No. 82–797 (D.Del. filed Dec. 10, 1982).

2. *Kalmanovitz v. G. Heileman Brewing Co., Inc.,* C–83–0196–MHP (N.D.Cal. filed Jan. 14, 1983).

3. *Kalmanovitz v. Jacobs,* Case No. 111041 (Marin County Super.Ct. filed Jan. 17, 1983).

4. In its original motion, the Jacobs Group moved for summary judgment on plaintiffs' claim of tortious interference with contractual relations against the Jacobs Group (D.I. 116), on the ground that "a party to a contract cannot as a matter of law sue the other party to that contract for tortious interference." (D.I. 114 at 29.) *See Donohoe v. Watts,* 546 F.Supp. 753, 757 (D.D.C.1982); *Professional Investors Life Ins. Co. v. Roussel,* 528 F.Supp. 391, 403 (D.Kan.1981); W. Prosser, Handbook of the Law of Torts 934 (9th ed. 1971). The plaintiffs' brief in opposition to this motion (D.I. 127) did not address

this part of the Jacobs Group's motion. Plaintiffs conceded the Jacobs Group to be correct on this point at oral argument (D.I. 136 at 53–54), and the Court will therefore dismiss this claim.

5. *See United States v. G. Heileman Brewing Co.,* 563 F.Supp. 642 (D.Del.1983); *Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882 (D.Del.1982); *Jacobs v. G. Heileman Brewing Co.,* 551 F.Supp. 639 (D.Del.1982); *Pabst Brewing Co. v. Jacobs,* 549 F.Supp. 1068 (D.Del.) *aff'd,* 707 F.2d 1392 & 1394 (3d Cir.1982); *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. 1050 (D.Del.1982).

6. The members of the Jacobs Group owned shares in Pabst as follows: Irwin Jacobs-880,116 shares; Dennis Mathisen-86,763 shares; Gerald Schwalbach-86,663 shares; Daniel Lindsay-86,-763 shares. (D.I. 121, Ex. 1.)

The agreement provided that Kalmanovitz and the Jacobs Group would make a tender offer, through JMSL Acquiring Corporation ("JMSL"), for three million Pabst shares at $24 per share. As part of this agreement, Kalmanovitz was to become a 50% shareholder in PST Acquiring Corp. ("PST"), which wholly owns JMSL, for $1,000. On the day after JMSL had accepted at least three million Pabst shares under the tender offer (this day is referred to as the "Funding Date"), "[e]ach member of the Jacobs Group shall receive additional shares of PST equal in number to that which he then will own ... in exchange ... for his Pabst shares ... and the Jacobs Group shall contribute in the aggregate of $2,371,770." (D.I. 121, Ex. 1 at 3.) Kalmanovitz was required to pay $26.3 million in exchange for 250 additional PST shares and a PST note in the amount of $9.5 million principal. (*Id.*) PST was supposed to capitalize JMSL with its 1,140,305 Pabst shares and the tender offer contemplated a merger between Pabst and JMSL. The agreement also contained a reimbursement section:

> 5. The Jacobs Group agrees that if the transactions contemplated by this memorandum of terms do not close and members of the Jacobs Group sell their shares within six (6) months, then the Jacobs Group will reimburse PK [Paul Kalmanovitz] for all of his out-of-pocket expenses in connection with the proposed transactions.

> 6. It is understood that PST and/or JMSL and/or Pabst shall reimburse the Jacobs Group and PK for all out-of-pocket expenses incurred in connection with Pabst other than the costs involved in acquiring and carrying the Pabst shares.

(D.I. 121, Ex. 1 at 4–5.)

On October 27, 1982, JMSL announced their offer to purchase 3 million shares of Pabst for $24 per share. On November 10, 1982, HBC offered to purchase up to 5.5 million shares of Pabst for $27.50 per share.

According to the complaint filed in the California federal action, Jacobs told Kalmanovitz that he could not put up any additional funds to compete against Heileman for the Pabst stock and that he would need Kalmanovitz to obtain additional funds. (D.I. 41, ¶ 16 at 6.) As a result, the original Memorandum of Terms was amended by two letter agreements, both dated November 18, 1982, to provide that the JMSL tender offer price should be raised to $30. (D.I. 121 at 1.) Jacobs also promised Kalmanovitz in one of these letters that:

> In the event we decide that it is better for our group to sell our shares in Pabst, rather than continue to bid higher, you will receive fifty percent (50%) of all amounts in excess of $24.00 for all the shares in our group.

(D.I. 121, Ex. 6.)

On the same day, JMSL amended its prior tender offer, raising the price per share to $30. On November 23, 1982, the Memorandum of Terms was amended to permit JMSL to raise its offering price to $35 per share. (D.I. 121, Ex. 7.) The increased price was announced on the same day.

On November 24, 1982, this Court denied motions for preliminary injunctions against the Heileman Offer and against the JMSL Offer. Heileman announced after the hearing that it would reduce the number of shares sought in its offer to 4.25 million, that it had approximately 3.9 million shares already in its depository, and that a further announcement would be made by noon on November 26, 1982.

Jacobs and Mathisen both state in affidavits that their attorneys advised them "that HBC's announcement would likely have the effect of persuading shareholders to withdraw their shares from the JMSL Offer and tender them to HBC rather than risk being shut out of the HBC proration pool." (D.I. 122 at 3; *see* D.I. 129 at 7.) In this respect, Jacobs further commented that "I determined that the current JMSL [offer] was not the winning offer in the marketplace, but I did not feel that the transaction justified any increase in price by JMSL." (D.I. 129 at 7.) On November 26, 1982, the

Jacobs Group "decided that if Heileman would improve its offer both as to price and the number of shares sought, [it] would withdraw [its] support from the JMSL offer and support the HBC Offer." (D.I. 122 at 3.)

The Jacobs Group then entered into negotiation with Heileman. As a result, Heileman, Pabst and the Jacobs Group entered into an agreement in which HBC agreed to terminate its old offer and announce a new offer which increased the number of shares sought to 5.6 million, raised the price to $29, and increased the value of notes to shareholders from $20 to $24 per share. (D.I. 121, Ex. 10 at 1–3.) The Jacobs Group agreed to tender its shares under the new offer. (*Id.* at 12–13.) The parties agreed to dismiss all outstanding litigation related to the battle for control of Pabst. Upon dismissal of its lawsuits and purchase in the new HBC Offer of the Pabst shares owned by the Jacobs Group, the Jacobs Group would be entitled to a cash payment for expenses of $7.5 million, which cost would be shared equally by Pabst and Heileman. (*Id.* at 13–14.) Mathisen states in his affidavit that this only partially recompensed the Jacobs Group for its actual cost in seeking control of Pabst. (D.I. 122 at 5.)

On November 26, 1982, Jacobs called Kalmanovitz and informed him of the situation. According to Jacobs, Kalmanovitz refused to agree to this decision and Jacobs offered Kalmanovitz the opportunity to buy the Jacobs Group's interest in JMSL for $24 per share or to accept $5 million from Pabst and Heileman.[7] (D.I. 41 at 6.)

On December 2, 1982, HBC made its new tender offer and the following day, JMSL announced that it was terminating its offer. (D.I. 121 at 12.)

In response, Kalmanovitz made an offer on December 6, 1982, for 4.15 million shares of Pabst stock at a price of $32 per share[8] and four days later filed the Dela-

ware action and moved for a preliminary injunction to stop the HBC Offer. On December 20, 1982, this Court denied plaintiff's motion. (D.I. 20.) Heileman then raised its tender offer price to $32 per share and on December 22, 1983, the withdrawal date for the HBC Offer, Kalmanovitz raised his offering price to $40 per share. On December 23, 1982, however, HBC accepted for payment 5.6 million shares, the minimum number of shares sought by HBC, of Pabst that had been tendered and not withdrawn, thereby successfully completing the HBC tender offer. Kalmanovitz has not received any of the proceeds from the Jacobs Group's tender of its Pabst shares to HBC.

## THE ANTITRUST CLAIMS

Kalmanovitz alleges that the defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, by engaging in a combination and conspiracy to unreasonably restrain, attempt to monopolize, and actually monopolize interstate commerce in the purchase and sale of Pabst shares. Specifically, Kalmanovitz contends that the November 26, 1982 agreement entered into between the various defendants was in effect a price-fixing scheme by the defendants to set the price at $29 per share and to eliminate bidding for Pabst stock. According to the California federal complaint, this scheme was accomplished by inducing the Jacobs Group with a $7.5 million payment and offer to sell to them the Pabst Milwaukee Office at a below market value price, to withdraw the $35 per share offer, breach its contract with Kalmanovitz, and tender its shares into the new HBC $29 per share offer. (D.I. 41 at 7–8.)

The defendants contend that these claims should be dismissed for any one of three alternative grounds: (1) the transactions in Pabst stock do not constitute a relevant market under Section 2 of the Sherman Act and the alleged restraint in the purchase or

---

7. The complaint also alleges that Kalmanovitz was offered "participation in the below-market purchase of Pabst's Milwaukee office building." (D.I. 41 at 6.)

8. The offer was actually made by 21–115, Inc., a wholly-owned subsidiary of S & P Company, which in turn is wholly-owned by Kalmanovitz.

sale of the securities of a single company does not constitute trade or commerce under Section 1 of the Sherman Act; (2) the antitrust laws do not apply to these transactions because such an application would be inconsistent with the federal securities laws; and (3) Kalmanovitz lacks standing to sue under the antitrust laws because his basis for suing is as a shareholder of an allegedly injured corporation and such a suit may only be brought directly by the corporation. Alternatively, the defendants move for summary judgment on the ground that even if the antitrust laws do apply, there was no restraint of trade based upon the facts alleged by the plaintiff.

■ The Court will first consider the relevant market issue. The defendants contend that the transactions in the stock of a single issuer cannot constitute a relevant market under Section 2 of the Sherman Act. This argument was not rebutted by the plaintiff in his briefs or at the hearing on the motions. The Court, however, will analyze this issue to insure that it is properly and fully considered.

Professor Sullivan has defined the relevant market as being "the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." L. Sullivan, Handbook of the Law of Antitrust § 12, at 41 (1977). It is from the determination of the scope of the relevant market that the Court is able to measure whether the defendants have achieved, or attempted to achieve, such market power so as to constitute monopolization and thereby violate Section 2 of the Sherman Act. *See United States v. Grinnell Corp.,* 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966); Sullivan, *supra,* at 42. If the defendants' activities cannot be measured within the scope of a legally cognizable relevant market, there can be no Section 2 violation, for "[i]f the definition is drawn too narrowly and substitutes are excluded, the defendant's ability to affect price and output will be overstat-

ed." E. Gellhorn, Antitrust Law and Economics, at 91 (2d ed. 1981); *see generally United States of America v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945).

In the present case, Kalmanovitz contends that the relevant market is the market for the purchase and sale of Pabst shares. The Court, however, cannot consider this, as a matter of law, to be a legally cognizable market for Section 2 purposes. This alleged market does not possess the "width" that Professor Sullivan mentioned in his definition. To circumscribe a relevant market in the stock of a single company would only result in restricting competition in the securities market rather than promoting it. If the Court were to find such a relevant market, then every attempt to make a tender offer for the shares of a particular company would constitute a Section 2 violation. Congress implicitly recognized the frivolity of defining such a relevant market when it passed the Williams Act, Pub.L. No. 90–439, 82 Stat. 454 (1968). Rather than hold tender offers to be a violation of the antitrust laws, Congress passed laws regulating the flow of information to shareholders regarding such activity. Certainly, if Congress believed that tender offers unlawfully inhibited competition within the meaning of Section 2 of the Sherman Act, it would have prohibited them instead of establishing a means for regulating them.

In *In re TransOcean Securities Litigation,* 427 F.Supp. 1208 (N.D.Ill.1977), the court was presented with this precise issue, where the plaintiffs contended that the defendants had conspired by means of a tender offer to monopolize ownership in all the common stock of a corporation in which plaintiffs were shareholders. *Id.* at 1209. The court dismissed the antitrust claims, stating that the stock of the company "cannot be the relevant market for Section 2 purposes ...." *Id.* at 1210 & n. 4. In this respect, the court noted that any conduct on the part of the defendants that constituted market manipulation or coercion regarding the purchase and sale of the com-

pany stock could best be remedied by the federal securities laws. *Id.* at 1210 (citing *Schaeffer v. First National Bank of Lincolnwood,* 509 F.2d 1287, 1299–1300 (7th Cir.1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976)).

Thus, since the purchase and sale of Pabst stock cannot constitute a relevant market for Section 2 purposes, the Court will dismiss plaintiff's antitrust claims brought pursuant to Section 2 of the Sherman Act.

■ The plaintiff also alleges that the transactions in Pabst stock constitute trade or commerce for purposes of Section 1 of the Sherman Act. Likewise, the Court cannot accept this contention.

In order for a plaintiff to establish a violation of Section 1 of the Sherman Act, there must be a restraint of "trade or commerce." The Supreme Court has interpreted "trade or commerce" to be "commercial competition in the marketing of goods or services." *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940). In that case, the Supreme Court stated that the goal of the Sherman Act was:

the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services ....

*Id.* at 493, 60 S.Ct. at 992.

In applying the guidelines of *Apex,* this Court has difficulty in finding that transactions in the shares of the stock of a single issuer constitute trade or commerce under Section 1. The case law on this subject confirms the Court's views.

In *Bucher v. Shumway,* 452 F.Supp. 1288 (S.D.N.Y.), *aff'd,* 622 F.2d 572 (2d Cir.1978), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980), plaintiffs charged that an agreement between two companies to effectuate a friendly tender offer which had a fixed price per share, violated Section 1 because it deprived the target company's shareholders of the increase of the price per share that would have occurred if the two companies had bid against each other. *Id.* at 1289. In dismissing the Section 1 claims, Judge Tenney stated that transactions in a particular stock do not fall within the bounds of Section 1 as stated in *Apex. Id.* at 1290. Moreover, the *Bucher* court noted that:

a share of stock is not an item of goods the competitive pricing of which is deemed essential to the free market economy protected under the Sherman Act.... Indeed, except for those occasions when, for reasons of their own, tender offerors and the like are willing to pay a premium over the "going price," a share of stock is not priced competitively, either with shares of other issuers (to which it has no relevant relationship) or with a like share of the same class and issuer at the same given moment.

*Id.* at 1290–91.

Similarly, in *Schaefer v. First National Bank of Lincolnwood,* 326 F.Supp. 1186 (1970), *aff'd in part and rev'd in part on other grounds,* 509 F.2d 1287 (7th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976), the defendants were alleged to have conspired to create an artificially active market in a company's stock which had been purchased by the plaintiffs. The District Court dismissed the Section 1 claims because "the logical conclusion is that stock market manipulation schemes have never been within the Sherman Act." 326 F.Supp. at 1191–92.

These cases demonstrate that transactions in the stock of a single issuer cannot constitute a violation under Section 1 of the Sherman Act. Rather, it is the purpose of the federal securities laws, not the antitrust laws, to remedy egregious conduct in the purchase or sale of securities. *See Bucher, supra,* 452 F.Supp. at 1291. To hold otherwise would be to inhibit and unduly restrict the stock market. Certainly the antitrust laws were not designed to achieve such a result.

Along similar lines, the Court of Appeals for the Third Circuit ruled that the Sher-

man Act is inapplicable for the control of ownership of a business. *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).[9] This Court therefore holds that any restraint of trade in the transactions of Pabst stock as alleged by Kalmanovitz cannot constitute an antitrust violation.

Thus, this Court finds that the plaintiff has failed to state a cognizable claim under Section 1 and 2 of the Sherman Act against all the defendants. In so ruling, the Court is reminded of Judge Goettel's statement that "numerous cases are filed in the federal district courts attempting to make antitrust claims out of what are, at most, contract claims or fraud claims." *Reisner v. General Motors Corp.*, 511 F.Supp. 1167, 1178 n. 25 (S.D.N.Y.), *aff'd*, 671 F.2d 91 (2d Cir.1981), *cert. denied*, — U.S. —, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982).

This Court's holding, of course, does not pass positive judgment on the defendants' activities, for the Court still has before it plaintiff's federal securities claims regarding this activity. The viability of defendants' activity under the securities laws, however, is not before the Court at this time.

Since the Court will dismiss the plaintiff's antitrust claims on the above-stated grounds, it need not consider the defendants' alternative reasons for dismissing these antitrust claims.

## THE TORTIOUS INTERFERENCE WITH CONTRACT OR PROSPECTIVE ADVANTAGE CLAIM

Kalmanovitz also contends that Heileman, HBC, Smith, Cleary and Pabst tortiously interfered with the contractual relationship between Kalmanovitz and the Jacobs Group and as a result, he has been damaged, because the "contractual relationship ... would have yielded profits to" Kalmanovitz and "would have resulted in

plaintiff's acquisition of Pabst ...." (D.I. 41, ¶ 32 at 10.)

Thus defendants contend that as a matter of law, there was no breach of contract nor any inducement by them to the Jacobs Group to breach the contract and that therefore this claim should be dismissed.

In deciding this issue, the opposing parties were in agreement at oral argument that for purposes of this motion, it is irrelevant whether California or Delaware law applies to this claim. (D.I. 136 at 45, 59.) Both jurisdictions apparently recognize the validity of the Restatement's definition of tortious interference with contractual relations, which is:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

In order to find a party liable for such a tort, it is imperative that the allegedly induced party actually breached the contract. On the facts before the Court, however, there has been no showing as a matter of law, that Heileman, HBC, Smith, Cleary or Pabst induced the Jacobs Group to breach their contract with the plaintiff.

Kalmanovitz contends in its pleadings that the Jacobs Group was induced by the other defendants to tender its shares under the HBC Offer instead of tendering them under the PST Offer. What Kalmanovitz fails to acknowledge with regard to this claim is that the contract between himself and the Jacobs Group provided two means of performance. One way was for the Jacobs Group to tender its Pabst shares to PST. The other, alternative means of performance, as embodied in the November 18, 1982 letter, (D.I. 121, Ex. 6), was for the Jacobs Group to tender its shares to some

---

**9.** In *Tose,* the activity in question involved control of a partnership. The Third Circuit, however, stated in its opinion that the antitrust laws do not apply to "losses sustained in an intracorporate or intrapartnership power struggle." 648 F.2d at 892 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

other tender offer and then pay to Kalmanovitz fifty percent of all proceeds over $24 per share. It was this second method of performance that the Jacobs Group actually carried out.

Moreover, the contract provided that the Jacobs Group, and not Kalmanovitz, would decide which means of performance would be followed. The decision as to means of performance, as Jacobs and Mathisen stated in their respective affidavits, was premised upon the Jacobs Group's belief that the HBC Offer would prevail and that therefore the Jacobs Group did not want to be excluded from the HBC proration pool. (D.I. 129 at 7; D.I. 122 at 3.) In fact, as a result of this decision, the Jacobs Group was able to negotiate with Heileman which resulted in the opening of the proration by means of a new offering, a larger proration pool, and an increase in the offering price per share.

Thus, the fact that the Jacobs Group complied with the contract by performing in one acceptable method rather than the other cannot be the basis for a claim of tortious interference with contractual relations against Heileman, HBC, Pabst, Smith, or Cleary. Such a tort contemplates unlawful conduct that interferes with the performance of a contract. The defendants' conduct did not constitute such activity, for it did not interfere with performance of the contract by the Jacobs Group, but rather permitted them to effectuate one of the means of performance under the contract.

The Court points out that Kalmanovitz's claim for tortious interference with contractual relations is not directly related to the breach of contract claim against the Jacobs Group. That claim contends that after the Jacobs Group performed the contract by tendering its shares to HBC, Kalmanovitz and S & P were entitled to fifty percent of the proceeds above $24 per share, which amount the Jacobs Group has never paid to Kalmanovitz and S & P. No showing has been presented, however, nor is there any allegation in the complaint that Heileman, HBC, Pabst, Cleary or Smith induced the Jacobs Group not to pay Kalmanovitz or S & P this amount.

The Court, therefore, finds that as a matter of law, that Heileman, HBC, Pabst, Smith, or Cleary did not tortiously interfere with the contract or prospective advantage between Kalmanovitz and the Jacobs Group. Accordingly, this claim will be dismissed.

THE BREACH OF CONTRACT CLAIM

■ Kalmanovitz and S & P seek partial summary judgment on the issue of liability on their breach of contract claim against the Jacobs Group. Specifically, plaintiffs point to the November 18, 1982 letter as evidence that the Jacobs Group was unconditionally bound to pay Kalmanovitz and S & P fifty percent of all proceeds should the Jacobs Group sell its Pabst shares to others for more than $24 per share.

The Jacobs Group, however, disputes that they were unconditionally bound to make this payment to Kalmanovitz and S & P. In his affidavit, Jacobs states that in order to receive such a payment, Kalmanovitz agreed to abide by any decision of the Jacobs Group with regard to the disposition of its Pabst shares, since the Jacobs Group "faced the prospect of suffering much greater losses by reason of [their] substantial investment." (D.I. 129 at 6–7.) In this respect, the Jacobs Group contends that since Kalmanovitz refused to agree to the Jacobs Group's decision to tender to HBC and that Kalmanovitz attempted to block this offer by seeking a preliminary injunction to stop the offer and by making a competing tender offer (the 21–115 offer), Kalmanovitz failed to abide by the contract and therefore he is not entitled to any of the proceeds from the Jacobs Group's tender of its Pabst shares to HBC. Kalmanovitz and S & P argue that the Court cannot consider Jacobs' statement because it is barred by the parol evidence rule and that therefore there is no dispute that under the contract they were unconditionally entitled to payment.

Both parties agree that for purposes of this motion, that California law applies. Under that state's law, evidence that is

relevant but extrinsic to a contract is admissible to prove a "reasonably susceptible" meaning of the contract's language. *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644 (1968) (en banc); *In re Beverly Hills Bancorp.*, 649 F.2d 1329 (9th Cir.1981). As this case now stands before the Court, it would be inappropriate to consider the meaning of the November 18, 1982 letter without this extrinsic evidence in order to fully explain the letter's terse language.

Jacobs' averment that Kalmanovitz agreed to abide by the Jacobs Group's decision in order to collect his payment creates a genuine material factual dispute as to whether Kalmanovitz and S & P were entitled to this payment. Thus, this issue is not ripe for judgment as a matter of law, particularly in light of this Circuit's strict view towards summary judgment, *see Tomalewski v. State Farm Life Insurance Company*, 494 F.2d 882, 884 (3d Cir.1974). The Court will therefore deny plaintiff's motion for partial summary judgment on its breach of contract claim against the Jacobs Group.

CONCLUSION

The Court will therefore dismiss the plaintiff's Sherman Act and tortious interference with contractual relations claims, and will deny the plaintiffs' motion for summary judgment on the liability issue on its breach of contract claim against the Jacobs Group.

An order will be entered in accordance with this Opinion.