Dorothy S. **BUCHER**, Herbert Klion, as Trustees of Klion Employees' Pension Fund, and Bertha Wechsler, Plaintiffs,

v.

Forrest N. **SHUMWAY** et al., Defendants.

No. 76 Civ. 2420 (CHT).

United States District Court, S. D. New York.

June 14, 1978.

Golden, Wienshienk & Mandel, New York City, for plaintiffs; Philip Mandel, Ralph Wienshienk, Marc Owen Mandel, Bernard Rothman, Kass, Goodkind, Wechsler & Gerstein, New York City by Stuart D. Wechsler, Samuel K. Rosen, Patricia I. Avery, New York City, of counsel.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendant The Signal Companies, Inc., and certain individual named defendants; Samuel E. Gates, Lionel G. Hest, Stephen C. Muther, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Gulf & Western Industries, Inc. and certain individual named defendants; William P. Frank, Jonathan J. Lerner, Shepard Goldfein, Jemera Rone New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

The plaintiffs are shareholders and former shareholders of The Signal Companies, Inc. ("Signal"), one of the named defendants in this action which alleges violations of federal securities and antitrust laws and breach of fiduciary duty. The case concerns what is commonly referred to as a "friendly" tender offer for a certain number of the outstanding shares of Signal; more properly the reference to the tender offer should be in the plural since Signal itself and Gulf & Western Industries, Inc. ("Gulf & Western"), another named defendant, made simultaneous offers in a single document for a combined total of 6,400,000 shares of Signal's common stock at $20 per share. Plaintiffs charge, inter alia, that by agreeing between themselves to fix the offering price and to allocate the shares thus tendered, Signal, Gulf & Western and the other named defendants who are, variously, officers and directors of the two defendant corporations, conspired in illegal restraint of trade to acquire approximately one-third of Signal's shares "at a non-competitive price, below its fair value, and to protect the control of Signal by Signal Management." Complaint ¶ 9. They reason that this agreement deprived all Signal shareholders of a rise in the price of their shares which would otherwise have been generated if Gulf & Western and Signal had bid individually and competitively against each other and against Dresser Corporation ("Dresser"), another company which had an interest in acquiring control of Signal. They also argue that the agreement foreclosed a possibly beneficial change in Signal management. The alleged antitrust and securities law offenses cannot easily be parsed: the theory is that by agreeing to fix the price of the tender offer defendants committed a per se violation of the Sherman Act, 15 U.S.C. §§ 1 et seq., and, a fortiori, omitted to state the material fact that Gulf & Western would have been a potential competitor for Signal stock at a higher price had the agreement not been made.

There are two motions presently before the Court. Plaintiffs have moved for class action certification pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rules"); for reasons discussed below that motion is denied with leave to renew. Defendants have moved under Rule 12(c) for partial judgment on the Sherman Act claims urging alternatively that the complaint fails to state a claim upon which relief can be granted and/or that plaintiffs lack standing to assert the antitrust claim. For the following reasons, defendants' motion for partial judgment on the pleadings is granted on the first ground.

### The Antitrust Claim

Defendants have marshaled a number of arguments against plaintiffs' attempt to introduce onto the battleground for corporate control antitrust considerations beyond those expressed in Section 7 of the Clayton Act, 15 U.S.C. § 18 (proscribing acquisition of one corporation by another where the effect upon the consumer marketplace would be to diminish competition in a particular line of commerce pursued in a par-

ticular geographic market. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). In opposing what they regard as an unwarranted extension of antitrust law, defendants urge several variations on two basic themes: (1) the commercial dynamics of a tender offer are simply outside the compass of Sherman Act concerns and (2) the Williams Act, 15 U.S.C. §§ 78n(d)–(f) (an amendment to the Securities Exchange Act of 1934 which treats tender offers) specifically contemplates combinations of purchasers like these defendants and evinces, when read with the entire '34 Act, congressional intent to immunize such concerted activity from the intrusion of the Sherman Act and to address any transgressions via securities law alone.

Plaintiffs have responded by trumpeting the sweeping interdictions of the Sherman Act against all forms of price fixing, *see United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956), and by pointing to recent Supreme Court application of antitrust analysis to certain practices of the securities industry. *E. g., Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *United States v. National Ass'n of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). Plaintiffs argue that these cases demonstrate the interface between securities and antitrust law and that the "fixed price" offers in this case at least require scrutiny for possible antitrust violations. This Court disagrees.

Plaintiffs are able to gain their tenuous antitrust foothold because the Sherman Act in bold strokes forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Tracing the legislative history and purpose of the Sherman Act, the Supreme Court explained that

> [t]he end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detri-

ment of purchasers or consumers of goods and services  .  .  .  .

*Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). The Sherman Act may be applied where necessary to relieve sellers who, through conditions peculiar to the trades they ply, are exposed to predatory practices of purchasers who control the outlets for their goods or services. *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). No matter who the victim, however, the thrust of the law is to prevent impermissible diminution of business competition in a relevant market segment of the general trade or business of the nation. *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The Sherman Act is not applied except to "restraint upon commercial competition in the marketing of goods or services." *Apex Hosiery Co. v. Leader, supra,* 310 U.S. at 495, 60 S.Ct. at 993.

The purchase and sale of shares by an investor does not fit comfortably within this definition. Much less does the mere offer to purchase. A seller of the shares of a particular issuer is not engaged in the business of selling such shares as an ongoing trade, and the offeror or consortium of offerors is not the only market for the shares. *Cf. Rothberg v. National Banner Corp.,* 259 F.Supp. 414 (E.D.Pa.1966) (good antitrust claim stated where market for shares completely controlled by defendants allegedly conspiring to prevent shareowner from selling to anyone). Furthermore, despite the fact that the Congress has chosen through the securities law to monitor the passage of funds attendant on many investments, the common understanding is that a share of stock is not an item of goods the competitive pricing of which is deemed essential to the free market economy protected under the Sherman Act. Indeed, except for those occasions when, for reasons of their own, tender offerors and the like are willing to pay a premium over the "going price," a share of stock is not priced competitively, either with shares of other issuers (to which it has no relevant relation-

ship) or with a like share of the same class and issuer at the same given moment.

The conceptual difficulty which plaintiffs seek to exploit in this case inheres in the fact that while shares of stock are not conceived of as "goods," their mode of distribution is a form of "service," the business of an industry that *is* part of a trade or commerce susceptible of antitrust analysis and sanction. Thus the Supreme Court has looked at antitrust implications in a New York Stock Exchange mandate which arbitrarily deprived independent securities dealers of essential telephone links with the central market, *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); in an exchange and member-firm practice of fixing commission rates for smaller transactions, *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); and in restricted sales and distribution of mutual funds pursuant to an agreement among investment companies and associations of broker-dealers. *United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). In none of these cases was the pricing of an individual issuer's shares the subject of antitrust scrutiny; all pertained to industry-wide practices affecting some aspect of the general distribution of shares or to some unfair restraint of a business organization engaged in the brokering of shares to the public.

Although plaintiffs correctly cite the continued vitality of the principle enunciated in *Silver, supra,* 373 U.S. at 357, 83 S.Ct. at 1257, that the "Securities Exchange Act contains no express exemption from the antitrust laws" and that "[r]epeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary," they cannot likewise cite any case where the principle is applied other than to offending practices of the securities industry as such. There has been no antitrust application to deception or overreaching between the potential purchasers and sellers of publicly traded shares of a particular issuer, for as Judge Conner of

this district observed: "The antitrust statute was framed to preserve normal competitive forces in interstate markets against unreasonable inhibition . . . not . . to police the performance of private contracts." *Madison Fund, Inc. v. Charter Co.,* 406 F.Supp. 749, 751 (S.D.N.Y.1975). In the purchase and sale of listed shares of an individual issuer, supervising the formation and execution of those contracts is a matter of securities and not antitrust law.

This Court cannot find that antitrust considerations are germane to facts such as these, just as other courts have been unable to find a Sherman Act infraction—and concomitant treble damage relief—lurking among allegations of conspiracy to manipulate or fix the price of a securities purchase. For example, in *Norman v. Vickers Energy Corp.,* 427 F.Supp. 1208 (N.D.Ill.1977), plaintiffs were minority shareholders of Trans-Ocean Oil, Inc. They brought suit against the corporate majority shareholder after it had made a tender offer for all of the outstanding common shares of TransOcean. Alleging both securities and antitrust violations, plaintiffs contended that the defendant sought an impermissible monopoly in TransOcean shares and argued that securities law did not reach this allegedly improper diminution of "competition" in the shares. The antitrust claim was barred, the court stating that the mere offer to purchase could not violate the Sherman Act unless it were construed to conflict irreconcilably with the Williams Act, which implicitly sanctions tender offers. The court added that to the extent that market manipulation was alleged, securities law provided a remedy and the antitrust claims were, at best, superfluous.

In *Schaefer v. First Nat'l Bank,* 326 F.Supp. 1186 (N.D.Ill.1970), *aff'd,* 509 F.2d 1287 (7th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976), antitrust claims were made in connection with a securities fraud scheme involving manipulation of the market price of a publicly traded issue. The court of appeals concluded that the district court had properly dismissed the antitrust claims, which

were based on the theory that conspiracy to create and maintain an artificial trading price for the stock was "price fixing and . . . within the literal language of the Sherman Act." 509 F.2d at 1299. The appellate court endorsed the cumulative reasoning of the district court, which had ordered the dismissal on the grounds that: (1) the '34 Act's specific prohibition of securities price manipulation preempts the more generalized Sherman Act insofar as conduct occurs which is arguably actionable under both statutes; (2) market manipulation constitutes fraud and not the restraint of trade which is contemplated by the Sherman Act; (3) inconsistencies between the two statutes in periods of limitation, provision for attorney's fees and especially damage provisions demonstrate that Congress could not have intended securities fraud claims to be tried as a matter of restraint of trade.[1]

In the absence of any authority whatever to support their position, plaintiffs in this case have sought to explain away the cases holding against their theory by distinguishing securities price fixing in the fraudulent, or market rigging sense, from securities price fixing in the anticompetitive sense, positing that securities law focuses only on the former and that the latter is thus within the ambit of antitrust law. The argument is without merit. First, the '34 Act specifically proscribes "pegging, *fixing*, or stabilizing the price" of any security regis-

tered on a national exchange. 15 U.S.C. § 78i(a)(6) (emphasis added). It is axiomatic in statutory construction that when words of familiar usage are used in a statute they should be understood in their ordinary sense. *Malat v. Riddell*, 383 U.S. 569, 571, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) (per curiam); *NLRB v. Coca-Cola Bottling Co.*, 350 U.S. 264, 268–69, 76 S.Ct. 383, 100 L.Ed. 285 (1956). Moreover, the Court notes that the offense in *Gordon, supra*, the case upon which plaintiffs so heavily rely, was the industry-wide, *non*-fraudulent price fixing of commissions on exchange transactions under $500,000. Although this Court has explained that *Gordon* is totally inapposite to activity affecting the price of an individual stock, since the noncompetitive evil there addressed was a practice of the securities industry as a business or trade, it is nevertheless significant that plaintiffs' concept of "non-competitive price fixing" was found in *Gordon* to be within the purview of the securities law and of the SEC. Second, plaintiffs have not merely alleged restraint of trade in this tender offer but fraud as well; their complaint alleges securities law violations and states that the undisclosed aim of the offer was to permit Gulf & Western to acquire a large position in Signal at less than fair value through the acquiescence of Signal management and in order to preserve the latter's

---

1. The plaintiffs have sought to discredit the *Schaefer* case on the ground that it erroneously interpreted the "savings clause" in the '34 Act to explicitly prohibit any claim under the Sherman Act. The statute in question, Section 28(a) of the '34 Act, 15 U.S.C. § 78bb(a), provides in pertinent part:

> The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

The *Schaefer* district court concluded that because the damage limitation is found immediately after the savings clause, "only single damage remedies were to be preserved [and] [t]hus, even if there once existed a Sherman

Act cause of action for market manipulation, it was not saved by the later Securities Acts." *Schaefer, supra*, 326 F.Supp. at 1192. The court then invoked the same statutory language to refuse punitive damages, stating "it is now authoritatively established that only actual, and not punitive, damages are recoverable." *Id.* at 1193.

Plaintiffs distort the precedents when they state generally that the *Schaefer* interpretation of the '34 Act damage limitation language has been "overwhelmingly repudiated by subsequent decisions." Plaintiffs' Memorandum of Law at 32. Plaintiffs are correct only on the matter of the *Schaefer* position toward punitive damages. *See, e. g., Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974). There has been no challenge to the first *Schaefer* hypothesis that Section 28(a) demonstrates a legislative intent to forestall treble damage remedies for activities cognizable under the '34 Act.

power. Finally, plaintiffs have failed to identify the competition that was being impeded in this case. If it was competition for the common stock of Signal, then the notion is untenable, for defendants merely made an offer and other markets beyond that offer continued to flourish while it was outstanding. If it is contended that purported rival Dresser's "right to compete" for Signal stock was infringed by the combined tender offer, then only Dresser would have the right to complain of it.

Because this Court concludes that antitrust concerns do not apply in the first instance to an arrangement by two parties to purchase shares at an agreed-upon price, defendants' arguments and plaintiffs' counterarguments on the intent and pervasiveness of the securities law and on implied repeal or "superfluity" of antitrust law on these facts are now largely irrelevant. Suffice it to say that perusal of the '34 Act—particularly those sections related to tender offer—demonstrates that the Congress fully contemplated combinations of purchasers in a tender offer such as was made here. One need look no further than the introductory discussion of the legislation known as the Williams Act which broadened the '34 Act to include control of tender offers: "The [tender] offer normally consists of a bid by an individual *or group* to buy shares of a company—usually at a price above the current market price." H.R.Rep.No.1711, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, p. 2811

(emphasis added).[2] Clearly, the "purchaser" is contemplated in the plural as well as the singular; just as clearly, the price contemplated is one uniform price. Furthermore, when Congress insured that all tender offerees be treated fairly by mandating that all who accept the offer receive the highest price bid for shares during the offer, 15 U.S.C. § 78n(d)(7), it necessarily required the purchasing "group" to agree upon one price for all. This Court is unwilling to conclude that the Congress was so addlepated as to have carefully legislated regulatory procedures for an activity it elsewhere forbade in the exercise of its legislative power.

Plaintiffs argue that requiring purchasers not to discriminate between various shareholders "is an entirely different matter from saying all buyers must offer the same price as each other." Plaintiffs' Memorandum at 42. Manifestly the Williams Act requires no such thing *except* where a group of purchasers makes a bid for shares. However, when plaintiffs attempt to distinguish between "proper" and "improper" groups of buyers for purposes of tender offer, *id.* at 41, they are in statutory limbo and clearly beyond any legislative intent. By parity of plaintiffs' reasoning the offer to purchase any ongoing business at an agreed-on price by a group of persons would also be an illegal restraint of trade, and by force of any logic that theory is not only absurd but arguably one which itself fosters restraint of trade by forcing out of

**2.** The Congress has never directly addressed the management-strengthening technique of the combined issuer/outsider tender offer, and the legislative history of the Williams Act seems to contemplate only the traditional "hostile" takeover bid. However, the same report which explains the tender offer legislation contains a discussion of additional investor protection devices, and the theory there expressed sheds some light on the instant problem. Immediately following the section on tender offer is the rationale for a '34 Act amendment which broadens disclosure requirements when a corporation repurchases its own shares. Within this section there is specific allusion to the purpose of management in pursuing such a course, and acknowledgement that "[r]epurchase programs . . . may . . . be utilized by managements to preserve or

strengthen their control by counteracting tender offers or other attempted takeovers." H.R.Rep.No.1711, *supra,* U.S.Code Cong. & Admin.News 1968 at 2814–15. Given that the Congress has explicitly recognized management's interest in preserving its own incumbency and has deemed it to be adequately dealt with by requiring full and fair disclosure to the shareholders, it does not seem antithetical to any Congressional purpose that the issuer and an outside corporation might combine to strengthen management so long as the shareholder is fully apprised of that aim. Moreover, juxtaposition of the two subjects—traditional "takeover" bid and issuer repurchase—within the same explanatory test lends support to the idea that the Congress would consider a combination purchase by issuer and outsider to be within the purview of the securities law.

the investment capital marketplace any but those who have the resources to make an independent offer for control. The plain fact is that nowhere in the Williams Act is it intimated—nor could it be intimated—that the purpose of the legislation is to force up the market by requiring possible contenders for corporate control to bid competitively so that the lucky shareholder of an attractive "target" company can reap a windfall. The sole purpose of the Williams Act is to provide information to the investor so that he may make a rational decision whether or not to tender all or part of his shares. H.R.Rep.No.1711, *supra*, *U.S.Code Cong. & Admin.News* 1968 at 2812–14. If he finds that fraud has tainted that decision or impermissibly impinged upon his ability to dispose of his shares in a market honestly reflective of corporate worth, then he has recourse to the securities law.

*Class Action Certification*

Dismissal of the antitrust claim creates serious difficulties on the subject of certifying a class for purposes of the remaining securities law and pendent fiduciary breach causes of action. The original class suggested by plaintiffs consisted of "all of the owners of common stock of the Signal Companies, Inc. . . . and of all of the owners of Signal's $1.00 and $2.20 Dividend Cumulative Convertible Preferred Stock . . . on or after April 12, 1976, other than such shareholders who are named as defendants herein." Complaint ¶ 2(b). April 12, 1976 was the date on which the joint tender offer was publicly announced; designation of the entire body of Signal shareholders on and after that date was presumably predicated on the now-discredited theory that all had a viable cause of action for impermissible restraint of trade resulting in an artificially depressed stock price. With that cause of action out of the case, the class claiming violations of Section 10(b) of the '34 Act, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, would be limited to those who can qualify as "purchasers or sellers" within the rule of *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct.

1917, 44 L.Ed.2d 539 (1975). By contrast, there are many more shareholders who might claim a right of action implied under Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e). It has been explicitly held that under section 14(e) "a plaintiff may gain standing if he has been injured by fraudulent activities of others perpetrated in connection with a tender offer, whether or not he has tendered his shares." *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 596 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). In *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), however, the Supreme Court specifically declined to rule on the possibility that Congress intended to protect both tendering and non-tendering shareholders under Section 14(e) of the Williams Act. *Id.* at 38–39 and n. 25, 97 S.Ct. 926.

In order for this Court to fairly assess the propriety of allowing this action to be conducted under Rule 23, it is now incumbent upon the plaintiffs to redefine the class or subclasses suing, the statutory base upon which they sue, and the damage claimed by the class or classes. The Court must also be apprised of the particular material misstatements or omissions upon which the class or classes rely in charging a securities law violation, since in the original complaint the purportedly misleading omissions pertained to concealment of "anticompetitive" activity now deemed not cognizable under the Sherman Act.

Accordingly, the Court will deny at this time plaintiffs' motion for class certification under Rule 23, with leave to renew the motion in light of the Court's ruling on the motion for judgment on the pleadings.

So ordered.