Paul **KALMANOVITZ**, individually and as a shareholder of Pabst Brewing Company, and S & P, a California Corporation, Appellants,

v.

**G. HEILEMAN BREWING COMPANY, INC.**, a Wisconsin corporation; Russell G. Cleary; HBC Acquisition, Inc., a Delaware corporation; Pabst Brewing Company, a Delaware corporation; and William F. Smith, Jr., Irwin Jacobs, Dennis Mathisen, Gerald A. Schwalbach, and Daniel T. Lindsay, individuals.

No. 84–5682.

United States Court of Appeals, Third Circuit.

Argued June 17, 1985.

Decided Aug. 1, 1985.

Alioto & Alioto, Joseph L. Alioto, Joseph M. Alioto, John I. Alioto (argued), Gary D. Elion, San Francisco, Cal., for appellants.

Young, Conaway, Stargatt & Taylor, Bruce M. Stargatt, David C. McBride, Wilmington, Del. (Foley, Lardner, Hollabaugh & Jacobs, Maurice J. McSweeney (argued), Washington, D.C., of counsel), for appellees G. Heileman Brewing Co., Inc., Russell G. Cleary and HBC Acquisition, Inc.

Morris, Nichols, Arsht & Tunnell, A. Gilchrist Sparks, III (argued), Michael Houghton, Wilmington, Del., Sutherland, Asbill & Brennan, Washington, D.C., Michael, Best & Friedrich, Milwaukee, Wis., for appellees Pabst Brewing Co. and William F. Smith, Jr.

James W. Quinn (argued), New York City (Weil, Gotshal & Manges, Jay N. Fastow, Richard B. Friedman, New York City, Richards, Layton & Finger, R. Franklin Balotti, Wilmington, Del., of counsel), for appellees Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay.

Before ADAMS and HUNTER, Circuit Judges, and FISHER, District Judge *.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal, certified to us by the district court, arises in the aftermath of a bitter fight to gain control of Pabst Brewing Company. Plaintiff, a disappointed tender offeror, has sued his former partner, the successful acquiring company, and the target company, alleging violations of the federal antitrust and securities laws; in addition, plaintiff raised a variety of state law claims. Except for a breach of contract claim, the district court either dismissed or granted summary judgment to the defendants on all federal and state law causes of action. We will affirm the district court's judgment and remand the case for further proceedings on the breach of contract claim.

I.

On October 26, 1982, Paul Kalmanovitz and Irwin L. Jacobs, along with three of Jacobs' associates (the Jacobs Group),[1] signed a Memorandum of Terms. According to this memorandum, Kalmanovitz and the Jacobs Group agreed to make a tender offer for three million shares of Pabst Brewing Company at $24 per share through JMSL Acquiring Corporation. The Jacobs Group already owned more than 1.14 million shares of Pabst; acquisition of the additional three million shares would have given the parties a majority of the outstanding Pabst shares.

As part of the agreement Kalmanovitz and the Jacobs Group each were to become 50 percent shareholders in PST Acquiring Corporation, which wholly owned JMSL.

---

* Hon. Clarkson S. Fisher, Chief Judge, United States District Court for the District of New Jersey, sitting by designation.

1. The Jacobs Group consisted of Jacobs, Dennis Mathisen, Gerald A. Schwalbach, and Daniel T. Lindsay.

On the day after JMSL accepted the three million shares on its tender offer, the Jacobs Group was to exchange its 1.14 million Pabst shares for additional shares of PST. In addition, Kalmanovitz was to contribute $26.4 million to PST in exchange for additional shares of the company. The agreement and the material accompanying the tender offer contemplated a subsequent merger of Pabst and JMSL.

On October 27, 1982, JMSL made public the terms of its tender offer. The management of Pabst opposed the offer. Thereafter, William F. Smith, Jr., Pabst's president, instituted a series of meetings with Russell G. Cleary, chief executive officer of Heileman Brewing Co., in search of a "white knight"—*i.e.*, another entity willing to make an offer more acceptable to the management of the target company. As a result of these meetings, on November 10, 1982, HBC Acquisition, Inc., a wholly-owned subsidiary of Heileman, commenced a competing tender offer for 5.5 million shares of Pabst at $27.50 per share.

In the wake of Heileman's offer, Jacobs allegedly told Kalmanovitz that the Jacobs Group could not put up any additional funding to compete against the new offer. Kalmanovitz therefore agreed to obtain additional financing, and on November 18, 1982, Kalmanovitz and the Jacobs Group amended the Memorandum of Terms by letter agreement providing that JMSL would raise its offering price to $30 per share and that Kalmanovitz would increase his cash participation in the deal to $44.4 million. In a separate letter written on the same date, Jacobs promised that

> [i]n the event we decide that it is better for our group to sell our shares in Pabst, rather than continue to bid higher, you will receive fifty percent (50%) of all amounts in excess of $24.00 for all the shares in our group.

App. at 225.

On November 23, 1982, JMSL again raised its tender offer, this time to $35 per share. The new offer was made possible by Kalmanovitz' promise to increase his cash participation to $59.4 million. The next day, the district court denied cross-motions by JMSL and HBC to enjoin each others' offers. After the hearing, Heileman announced that it would reduce the number of shares sought to 4.25 million, that 3.9 million shares had already been tendered to it, and that the company would make a further announcement (presumably regarding the price offered per share) by November 26, 1982.

During the afternoon of November 24, Jacobs telephoned Cleary and expressed concern regarding the ability of the Jacobs Group to proceed further in the tender offer battle. Jacobs then informed Cleary that he would withdraw from the bidding in exchange for $7.5 million. Jacobs avers that the motivation for this decision was his attorney's advice that the HBC tender offer would probably prevail and his fear of being shut out of HBC's proration pool.

Negotiations between the Jacobs Group and Heileman ensued, and on November 26, 1982, they signed an agreement which provided that (1) HBC would make a new tender offer for 5.6 million Pabst shares at $29 per share; (2) the Jacobs Group would tender its 1.4 million shares under the new offer; (3) the parties would dismiss all outstanding non-derivative litigation; and (4) Pabst and Heileman would reimburse the Jacobs Group $7.5 million for its expenses.

Later that day, Jacobs informed Kalmanovitz of the new deal with Heileman and offered to pay plaintiff $5 million if he agreed to withdraw from the bidding. The offer was rejected. On December 2, 1982, HBC made its $29 tender offer, and JMSL withdrew its offer the following day. Not conceding defeat, Kalmanovitz then made a tender offer for 4.15 million shares at $32 per share through 21–115, Inc., a corporation wholly owned by plaintiff. Four days later, on December 10, 1982, Kalmanovitz instituted the present action in the district court in Delaware, requesting a preliminary injunction against HBC. On December 20, 1982, the district court denied the preliminary injunction, and on December 22, 1982—the withdrawal date for the HBC offer—Kalmanovitz increased his tender

offer to $40 per share. On December 23, 1982, however, Heileman accepted for payment 5.6 million Pabst shares, thus ending the contest for control of the brewing company. To date plaintiff has not received any of the proceeds from the Jacobs Group's tender of its Pabst shares to HBC.

The procedural history of this case is somewhat complex inasmuch as the present appeal stems from the consolidation of three separate cases and has spawned no less than seven district court opinions.[2] Initially, Kalmanovitz, as a disappointed tender offeror and as a shareholder of Pabst, and S & P Co., a California corporation wholly owned by Kalmanovitz,[3] brought suit in the district court in Delaware. The complaint alleged violations of federal securities and antitrust laws and Delaware corporate law by G. Heileman Brewing Company, Russell G. Cleary, HBC Acquisition, Inc., Pabst, and William F. Smith, Jr.[4]

Subsequently, Kalmanovitz, individually and as a Pabst shareholder, filed suit in the district court in California, alleging similar federal claims and an additional California state law claim of tortious interference with contractual relations against the same parties and also against the members of the Jacobs Group. Almost immediately thereafter, plaintiff instituted a third action—based on breach of contract—in California state court against the Jacobs Group. After the latter case was removed to federal court in California, the two California federal cases were consolidated, transferred to Delaware, and then consolidated with the initial case.

In November of 1983, the district court dismissed plaintiff's claims based on §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), and his tortious interference with contract claim under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. *Kalmanovitz v. G. Heileman Brewing Co.*, 576 F.Supp. 922 (D.Del.1983). In September of 1984, the district court granted partial summary judgment to defendants with regard to the federal securities and Delaware state law claims. 595 F.Supp. 1385 (D.Del.1984). All that remains is the breach of contract claim against the Jacobs Group. Finding no just reason to delay the appeal of the claims dismissed, the district court certified its rulings under Fed.R.Civ.P. 54(b) as final for purposes of appeal. This Court accepted appellate jurisdiction under 28 U.S.C. § 1291 (1982).

## II.

■ Kalmanovitz alleges that defendants conspired unreasonably to restrain trade in Pabst stock in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1982). In particular, plaintiff contends that the November 26, 1982 agreement among the various defendants was an illegal scheme to eliminate competitive bidding for and to fix the price of Pabst stock at $29 per share. Defendants allegedly achieved their illicit goal by paying the Jacobs Group $7.5 million to scuttle JMSL's $35 per share bid, breach its contract with Kalmanovitz, and tender its shares in response to HBC's lower offer. The district court dismissed these allegations for failure to state a claim upon which relief may be granted.

---

2. *See Kalmanovitz v. G. Heileman Brewing Co.*, 595 F.Supp. 1385 (D.Del.1984); *Kalmanovitz v. G. Heileman Brewing Co.*, 576 F.Supp. 922 (D.Del.1983); *United States v. G. Heileman Brewing Co.*, 563 F.Supp. 642 (D.Del.1983); *Pabst Brewing Co. v. Kalmanovitz*, 551 F.Supp. 882 (D.Del.1982); *Jacobs v. G. Heileman Brewing Co.*, 551 F.Supp. 639 (D.Del.1982); *Pabst Brewing Co. v. Jacobs*, 549 F.Supp. 1068 (D.Del.), *aff'd*, 707 F.2d 1392, 1394 (3d Cir.1982); *Jacobs v. Pabst Brewing Co.*, 549 F.Supp. 1050 (D.Del.1982). The two most recent district court opinions form the basis of the present appeal.

3. Plaintiffs collectively will be referred to as plaintiff or Kalmanovitz.

4. Although Kalmanovitz was unsuccessful in obtaining control of Pabst in 1982, in February of 1985 plaintiff's S & P Corp. purchased a controlling interest in the part of Pabst not retained by Heileman. Consequently, and so as not to be put in the position of suing himself, plaintiff dismissed his claims against Pabst and Smith.

Plaintiffs are correct that on its face, § 1 prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. This Court has noted, however, that it is "well established" that the statute cannot be read literally, *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 890 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), otherwise "§ 1 would outlaw the entire body of private contract law." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). One such limitation on the reach of § 1 of the Sherman Act is that the alleged restraint must involve "trade or commerce" within the meaning of the statute.

In *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940), the Supreme Court defined "trade or commerce" to be "commercial competition in the marketing of goods or services." After examining the legislative history and purpose of the Sherman Act, the Court concluded that the

> end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services....

*Id.* at 493, 60 S.Ct. at 992.

Accordingly, we must determine whether a transaction of the type involved in the present case concerning the stock of a single company constitutes trade or commerce within the meaning of § 1 of the Sherman Act, *i.e.,* whether it affects the purchasers or consumers of goods and services. We conclude that it does not.

The primary purpose of section 1 is to prevent the diminution of competition in the marketing of goods and services, *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004,

100 L.Ed. 1264 (1956); the sale of stock of a single company within the context of a takeover battle for that one company does not fall within this definition. The antitrust laws simply were not designed to regulate this type of corporate power struggle. *Cf. Tose,* 648 F.2d at 892 ("losses sustained in an intracorporate ... power struggle 'are of no concern to the antitrust laws' ") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). Other laws, such as federal security and state corporate laws, stand guard over the excesses endemic to corporate takeovers.

In *Bucher v. Shumway,* 452 F.Supp. 1288 (S.D.N.Y.1978), *aff'd,* 622 F.2d 572 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). The Signal Companies and Gulf and Western Industries jointly made a tender offer for approximately one-third of the outstanding shares of Signal. Plaintiffs, Signal shareholders, brought suit under § 1 of the Sherman Act against the two companies. Specifically, plaintiffs alleged that the agreement to effectuate a tender offer was an unreasonable restraint of trade because it fixed the price of Signal's shares and thereby deprived the company's shareholders of a rise in price that otherwise would have occurred if the two parties had bid competitively. *Id.* at 1289. Reasoning that transactions in a particular stock do not fall within § 1, the court dismissed the Sherman Act claims. *See also Schaefer v. First National Bank,* 326 F.Supp. 1186 (1970), *appeal dismissed,* 465 F.2d 234 (7th Cir.1972).

As noted, the Sherman Act applies only to a "restraint upon commercial competition in the marketing of goods or services." *Apex Hosiery,* 310 U.S. at 495, 60 S.Ct. at 993. The court in *Bucher* observed that the purchase or sale of stock by *investors* does not fit easily within the definition of goods or services as used by the antitrust laws.[5] A seller of shares of a particular

---

**5.** As will be discussed, *infra,* system-wide abuses in the securities industry have been held to have antitrust implications.

company is not engaged in the business of selling shares as an ongoing trade or business. *Bucher*, 452 F.Supp. at 1290.[6]

Kalmanovitz has sought to create and then take advantage of a conceptual confusion in the difference between the stock of a single company and the mode by which it is distributed. Although in the typical case the stock of a single company may not be a "good" within the meaning of the antitrust laws, the systematic distribution of the company's securities may well be a "service" which is subject to those laws. *See id.* at 1291.

To support the applicability of the antitrust laws here, plaintiff points to a number of cases in which the antitrust laws have been applied to the securities industry. *See, e.g., United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) (restricting sales and distribution of mutual funds); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (stock exchange's deprivation to independent securities dealers of essential telephone links with central market); *Harwell v. Growth Programs, Inc.*, 451 F.2d 240 (5th Cir.1971) (permitting purchasers of "in-and-out" privileges to mutual fund shares to bring an antitrust suit against the National Association of Securities Dealers), *cert. denied*, 409 U.S. 876, 93 S.Ct. 126, 34 L.Ed.2d 129 (1972). These cases, however, involve industry-wide practices affecting some aspect of the general distribution of shares or the brokering of shares to the public; they do not involve fixing the price of a single issuer's shares in a tender offer. *See Bucher*, 452 F.Supp.

at 1291.[7] Plaintiffs' reliance on them is therefore misplaced.

Kalmanovitz argues further that the district court's dismissal of his antitrust claim is improper because the federal securities laws have not preempted the antitrust laws. The Supreme Court has stated that the federal securities laws contain no express exemption from the antitrust laws and that therefore any preemption is to be implied "only if necessary to make the [securities laws] work, and even then only to the minimum extent necessary." *Silver*, 373 U.S. at 357, 83 S.Ct. at 1257; *see also Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 682–83, 95 S.Ct. 2598, 2611–12, 45 L.Ed.2d 463 (1975). Plaintiff's assertion that the antitrust laws are not preempted by the securities laws is correct, but we do not hold that the Sherman Act was impliedly repealed by the federal securities laws. Rather, we hold merely that § 1 of the Sherman Act, by its own terms, does not apply to the present situation.

When the broader context of this case is considered, this result appears to be consonant with the intent of Congress. In 1968, Congress amended the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78a *et seq.*, by enacting the Williams Act.[8] The purpose of the Williams Act was to protect investors confronted with the decision whether or not to participate in a tender offer. *See Piper v. Chris-Craft Industries*, 430 U.S. 1, 22–27, 97 S.Ct. 926, 939–42, 51 L.Ed.2d 124 (1977); *Flynn v. Bass Brothers Enterprises, Inc.*, 744 F.2d 978, 983–84 (3d Cir.1984). Congress permitted tender offers and accomplished its goal by regulating the practices of tender offerors. Even a cursory perusal of the

---

**6.** In *Rothberg v. National Banner Corp.*, 259 F.Supp. 414 (E.D.Pa.1966), the court permitted an antitrust case to proceed against the broker-defendants who were the sole market makers in the stock of a company. Accordingly, the defendants treated the securities as part of their stock in trade, and not merely as the vehicle for gaining control of the company.

**7.** If defendants had conspired to restrain competition in tender offers generally or if lending

institutions combined with certain tender offerors to restrain trade in tender offers generally, antitrust implications might be raised, *see Tose*, 648 F.2d at 892–93 (conspiracy to deny access to the credit markets raises antitrust concerns), but such issues are not before us today.

**8.** Pub.L. 90–439, 82 Stat. 454 (1968), codified as amended at 15 U.S.C. §§ 78*l*(i), 78m(d)–(e), 78n(d) to (f) (1982).

legislative history of the Williams Act demonstrates that Congress contemplated that more than one party might make a tender offer. "The [tender] offer normally consists of a bid by an individual *or group* to buy shares of a company—usually at a price above the current market price." H.R.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 2811 (emphasis added).

Given the vast sums required today to make the usual tender offer, it is not conceivable that Congress intended that only single individuals or corporations could make tender offers. Such a rule would inhibit rather than promote competition, as few entities could accumulate the necessary financial resources on their own.[9] Moreover, present economic realities require, at a minimum, that the offeror arrange financial backing from one or more lending institutions. If such arrangements were deemed violative of the Sherman Act, most if not all tender offers, as a practical matter, would be rendered illicit. Finally, we note that when Congress mandated the equal treatment of all offerees by requiring that the highest price offered be paid to all those who tender, 15 U.S.C. § 78n(d)(7), it necessarily approved of offerors agreeing to fix the price to be offered.[10] Thus had we determined that the Sherman Act was applicable, we might have been constrained to hold the antitrust laws preempted in this context. *Cf. Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 682–91, 95 S.Ct. 2598, 2611–15, 45 L.Ed.2d 463 (1975) (holding antitrust laws inapplicable to fixed stock commission rates supervised by the SEC).

### III.

▇ Kalmanovitz maintains that defendants, in connection with the HBC offer, violated §§ 13(e), 14(d), and 14(e) of the Exchange Act, 15 U.S.C. §§ 78m(e), 78n(d), 78n(e) (1982). Because it found that plaintiff did not have standing to bring a private damages suit under these provisions, the district court granted defendants' motions for summary judgment on these claims.

In *Piper v. Chris-Craft Industries*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), Chris-Craft, a disappointed tender offeror, brought suit against Bangor Punta, the successful tender offeror, and Piper, the target corporation, under § 14(e) of the Exchange Act. After an exhaustive analysis of the Williams Act, the Supreme Court concluded that "the sole purpose of the Williams Act·was the protection of investors who are confronted with a tender offer." 430 U.S. at 35, 97 S.Ct. at 946; *see also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). Thus the Court held that a disappointed tender offeror had no standing to bring a claim for damages under § 14(e), the general antifraud provision of the Williams Act.

Kalmanovitz recognizes that he cannot assert his claim under § 14(e) by virtue of his status as a tender offeror. Instead, he argues that his status as a Pabst shareholder gives him standing to bring suit.[11] In *Piper*, the Supreme Court left open the questions whether a private right of action exists under § 14(e) and, if so, whether a shareholder has standing to assert such a claim.

Arguing by analogy to *J.I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), in which the Supreme Court permitted a private right of action to a shareholder for a violation of § 14(a) of the Exchange Act, and by reference to the Court's explicit statements regarding the Williams Act's purpose—to protect share-

---

**9.** Indeed, if plaintiff's assertions were correct, then his initial agreement with ˙the Jacobs Group to make a tender offer for Pabst would also have been in violation of the Sherman Act.

**10.** Plaintiff has abandoned his appeal from the district court's dismissal of his claim under § 2 of the Sherman Act.

**11.** Kalmanovitz owned 20 shares of Pabst stock at the time he filed his various actions.

holders of a target company—Kalmanovitz contends that shareholders should be permitted a private right of action for damages under § 14(e). *See* Note, *Private Causes of Action Under SEC Rule 14e–3*, 51 Geo.Wash.L.Rev. 290 (1983) (advocating a private right of action under § 14(e)). Although plaintiff's contention arguably may be correct, our disposition of this case does not require us to decide that issue.

Assuming arguendo that a shareholder may bring suit under § 14(e), Kalmanovitz still lacks standing to proceed in the present case. This Court recently noted that even though a private right of action may be implied from a particular statute or rule, not every private suit brought thereunder is proper. *See Angelastro v. Prudential-Bache Securities, Inc.*, 764 F.2d 939, 948 n. 13 (3d Cir.1985). One such example is that in an action brought under Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (1984), the plaintiff must be a purchaser or seller of securities. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975). Similarly, in *Piper*, 430 U.S. at 35, 97 S.Ct. at 946, the Court held that a disappointed tender offeror lacked standing to bring suit under § 14(e) of the Exchange Act. We now must determine whether a disappointed tender offeror who is also a nominal shareholder of the target corporation has standing to bring suit for damages.

In addition to being a disappointed offeror, the plaintiff in *Piper* was a shareholder of the target company. Although plaintiff Chris-Craft did not explicitly argue that its shareholder status gave it standing to sue under § 14(e) of the Exchange Act, the Supreme Court nevertheless rejected this contention. *Piper*, 430 U.S. at 35–37, 97 S.Ct. at 946–947. In dissent, Justice Stevens maintained that there should be a private right of action under § 14(e) and that Chris-Craft's status as a shareholder was sufficient to grant it standing to sue. *Id.* at 56–59, 97 S.Ct. at 956–958 (Stevens,

J., dissenting). The majority did not reach the first conclusion, because it rejected the second one. It stated that the reason Chris-Craft did not assert standing as a Piper shareholder was

> not hard to divine. As a tender offeror actively engaged in competing for Piper stock, Chris-Craft was not in the posture of a target shareholder confronted with the decision of whether to tender or retain its stock. Consequently, Chris-Craft could scarcely have alleged a need for the disclosures mandated by the Williams Act. In short, the fact that Chris-Craft necessarily acquired Piper stock as a means of taking over Piper adds nothing to its § 14(e) standing arguments.

*Id.* at 35–36, 97 S.Ct. at 946. This result is not illogical since there may well be a conflict of interest between the positions of a target shareholder and a tender offeror. It would almost be a sham to permit an individual to bring suit formally in his capacity as a shareholder, when the suit is not in the interest of the target shareholders and in fact the person's true motivation, and his only real stake in the matter, stems from his position as an offeror.

During the takeover battle in *Piper*, the disappointed plaintiff acquired several hundred thousand shares of the target; in the present case, Kalmanovitz owned 20 shares of Pabst. The market value of these shares under HBC's winning tender offer was $640; Kalmanovitz' stake in the unsuccessful JMSL tender offer eventually reached almost $60 million. Much more strongly than in *Piper*, the gravamen of Kalmanovitz' complaint was grounded in his status as a tender offeror, not as a Pabst shareholder. As the district court noted, "given this miniscule stake in any possible recovery, his assertion of standing on the basis of a shareholder is without merit." 595 F.Supp. at 1392; *see also Luptak v. Central Cartage Co.*, [1981] Fed. Sec.L.Rep. (CCH) ¶ 98.034 (E.D.Mich.1979) (characterizing plaintiff as a competing tender offeror because his individual stake

in the suit as a shareholder was minimal in comparison to his interest as an offeror), *aff'd,* 647 F.2d 165 (6th Cir.1981). Thus we hold that a plaintiff who occupies the dual roles of a very substantial tender offeror and merely a nominal target shareholder may be considered to be only an offeror for the purpose of judging his standing to bring the types of claims plaintiff has asserted in this case.[12] For similar reasons, we conclude that the district court did not err in dismissing plaintiff's claims under §§ 13(e) and 14(e) of the Exchange Act.

### IV.

We affirm the district court's grant of summary judgment to defendants on plaintiff's claim under § 10(b) of the Exchange Act and Rule 10b–5 because Kalmanovitz was not a purchaser or seller of securities as required by *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). And we also affirm the dismissals and/or grants of summary judgments to defendants Kalmanovitz' various state law claims that were certified to this Court by the district court.

Accordingly, the judgments of the district court certified to us on appeal will be affirmed and the case remanded for disposition on plaintiff's breach of contract claim.

---

**12.** We in no way mean to suggest that for an individual who is not also a tender offeror, the amount of stock he or she owns is relevant for purposes of gauging standing to bring suit.