Michael **FINNEGAN**, on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

**CAMPEAU CORP.**, a corporation, R.H. Macy & Co., Inc., a corporation and Macy Acquiring Corp., a corporation, Defendants–Appellees.

No. 1005, Docket 89–9183.

United States Court of Appeals, Second Circuit.

Argued March 15, 1990.

Decided Oct. 4, 1990.

---

Robert A. Skirnick, New York City (Andrew Davidovits, Wechsler Skirnick Harwood Halebian & Feffer, New York City, Guido Saveri, Saveri & Saveri, San Francisco, Cal., Perry Goldberg, Specks & Goldberg, Chicago, Ill., Jeremiah F. Hallissey, Hallisey & Johnson, San Francisco, Cal., Gene I. Mesh, Gene Mesh & Associates, Cincinnati, Ohio, all of counsel), for plaintiff-appellant Michael Finnegan.

Helene D. Jaffe, New York City (Harris J. Yale, Judith M. Yellin, Weil, Gotshal & Manges, New York City, of counsel), for defendant-appellee R.H. Macy & Co., Inc.

Before KEARSE, CARDAMONE and MAHONEY, Circuit Judges.

CARDAMONE, Circuit Judge:

Before us is an appeal brought by Michael Finnegan, the representative of disgruntled shareholders of a target company, Federated Department Stores, Inc. (Federated), who alleges that he suffered economic injury actionable under the antitrust laws when R.H. Macy & Co., Inc. (Macy's) and Campeau Corp. (Campeau)—two rival bidders for a controlling interest in the target company—entered into a mutually advantageous agreement, effectively reducing the amount of money needed to gain control of Federated.

It is recognized that competition is the touchstone of the antitrust laws, while in the regulated securities industry the emphasis is on requiring full disclosure without otherwise changing the balance in the market for corporate control. Tension and

at times conflict exist between these established public policies. That conflict is present in this case. Since we cannot assume that Congress was so muddled that it gave with the right hand of securities regulation that which it then took away with the left hand of antitrust law, this lawsuit may not proceed. Although appellant makes an innovative argument for the application of the antitrust laws—more suitable for and in fact the topic of a law review article, *see* Rock, *Antitrust and the Market for Corporate Control*, 77 Calif.L. Rev. 1365, 1388–90 (1989)—those laws have no application to the instant litigation and appellant's redress, if any, must be found under the corporate or securities laws.

## BACKGROUND

The allegations of the complaint, which we must accept as true for purposes of reviewing this dismissal under Rule 12(b)(6), are fully set forth in the district court's opinion. *See Finnegan v. Campeau Corp.*, 722 F.Supp. 1114 (S.D.N.Y. 1989). We recite only those necessary to our discussion of the issues on appeal. In March 1988 Federated was "put into play," that is, offered for sale to the highest bidder and a battle for its control between Macy's and Campeau began. At first the rival bidders pushed up the price of Federated stock with each submitting a bid one step higher than the other. In April 1988 it dawned on the contestants that constantly raising the price of the target company was economically disadvantageous for them. Consequently, they allegedly reached an understanding under which Macy's agreed to withdraw its latest bid and allow Campeau to acquire Federated. In exchange, Campeau agreed to permit Macy's to purchase two Federated divisions—I. Magnin and Bullock's Wilshire—and to pay Macy's $60 million to cover its legal and investment banking expenses. The difference between the $73.50 a share ultimately paid by Campeau to acquire Federated and Macy's withdrawn bid of $75.51 amounted to about $172 million. Whether Campeau's purchase was worth the price it had to pay is questionable in light of Campeau's present insolvent condition and Federated's

Chapter 11 petition filed in the United States Bankruptcy Court in Cincinnati, Ohio. *See* N.Y.L.J., May 17, 1990, at 7, col. 3.

In his complaint Finnegan charges that the agreement between Macy's and Campeau constitutes a conspiracy in violation of § 1 of the Sherman Act (Act), 15 U.S.C. § 1 (1988). Specifically, he asserts that Macy's and Campeau conspired to "refrain[ ] from bidding against each other for the purchase of the shares of common stock of Federated in order to supress [sic], ... and eliminate competition in the market for Federated common stock and to cause the sale of said shares at a price lower than a competitive price." Macy's moved to dismiss Finnegan's complaint under Fed.R.Civ.P. 12(b)(6) and the United States District Court for the Southern District of New York (Haight, J.) granted the motion. *See also Case v. R.H. Macy & Co.*, N.Y.L.J., May 17, 1990, at 25, col. 3 (N.Y.Sup.Ct.) (dismissing claim by Federated shareholders under the state antitrust laws).

In deciding that the present transaction did not involve "trade or commerce" within the ambit of § 1 of the Act the district court relied on *Bucher v. Shumway*, 452 F.Supp. 1288 (S.D.N.Y.1978), *aff'd mem.*, 622 F.2d 572 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980), and *Kalmanovitz v. G. Heileman Brewing Company*, 769 F.2d 152 (3d Cir. 1985). *See* 722 F.Supp. at 1116. Following the conclusion that the antitrust laws were inapplicable, it reasoned that applying those laws would be inconsistent with the federal securities laws' regulatory scheme and pointed, as an example, to the limitation of damages under the securities laws to actual damages versus the treble damages available under § 4 of the Clayton Act, as did the court in *Schaefer v. First National Bank*, 326 F.Supp. 1186, 1192 (N.D.Ill.1970), *aff'd in pertinent part*, 509 F.2d 1287 (7th Cir.1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). 722 F.Supp. at 1118. Campeau apparently did not move in the district court, though it received the benefit of the dismissal, *see* 722 F.Supp. at 1118, and did not

submit briefs or participate in oral argument in our Court in response to Finnegan's appeal from the dismissal of his complaint.

## DISCUSSION

■ As a preliminary matter we note that Finnegan has standing to bring this civil action under § 4 of the Clayton Act, 15 U.S.C. § 15 (1988), which provides "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" in federal court.

A claim analogous to the one at bar was presented in *Bucher*, and dismissal there was affirmed in an unpublished opinion. Appellant urges that we not apply the reasoning of the district court in *Bucher* because his claim is factually distinguishable. In *Bucher* the Signal Companies and Gulf and Western Industries made a joint tender offer for one-third of the outstanding shares of Signal. Suit was brought by shareholders of Signal who alleged that they received a lower price for their shares because Signal and Gulf and Western did not compete against each other for the company and against a third bidder, Dresser Company, but made a joint bid for the company. Presumably the difference between *Bucher* and the present case is that in the former the two bidders, Signal and Gulf and Western, made a joint bid at the outset, while in the case at hand Macy's and Campeau entered the takeover battle as active competitors, and only during the bidding process did they reach agreement on the acquisition of Federated.

### I  *Applicability of the Sherman Act*

■ Although we agree with the ultimate conclusion reached in the trial court that the Sherman Act has no application to this case, we reach it for somewhat different reasons. We do not, as did that court, adopt the rationales of *Bucher* and *Kalmanovitz. See Finnegan*, 722 F.Supp. at 1116. These courts premised their decisions to dismiss antitrust claims on the theory that the sale of the stock of a single company is not within the meaning of

"trade or commerce" under the Sherman Act as that Act was construed in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940):

> The end sought [by the Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of *goods and services*, all of which had come to be regarded as a special form of public injury.

*Id.* at 493, 60 S.Ct. at 992 (emphasis supplied). Based upon this language those courts found the Act inapplicable because "a share of stock is not an item of goods." *Bucher*, 452 F.Supp. at 1290; *accord Kalmanovitz*, 769 F.2d at 156–57.

We think this isolated statement in *Apex Hosiery* has been misperceived. The Supreme Court did not intend the application of the antitrust laws to be limited to "goods" qua "item of goods." Black's Law Dictionary acknowledges that "goods" is "[a] term of variable content. It may include every species of personal property or it may be given a very restricted meaning." *Black's Law Dictionary* 823 (4th ed. 1968). That the Supreme Court meant the term "goods" to be viewed in the broader sense is evidenced by its holding during the same term as *Apex Hosiery* was decided that the antitrust laws covered agreements to restrain "the price of a *commodity* in interstate or foreign commerce," *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940) (emphasis supplied), and subsequent Supreme Court decisions have adhered to this broader position, *see, e.g., Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980) (per curiam). *See also Black's Law Dictionary* 343 (4th ed. 1968) (defining "commodity" as "any movable or tangible thing that is produced or used as the subject of barter or sale").

The Court also has refused to exempt banks from the antitrust laws simply because they "deal[ ] in the intangibles of credit and services rather than in the man-

ufacture or sale of tangible commodities." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 368, 83 S.Ct. 1715, 1744, 10 L.Ed.2d 915 (1963). Following that lead, at least one federal court has applied the antitrust laws to predatory practices involving sales of stock. *See Rothberg v. National Banner Corp.*, 259 F.Supp. 414, 416 (E.D. Pa.1966); *see also Strobl v. New York Mercantile Exch.*, 768 F.2d 22 (2d Cir.) (applying the antitrust laws to commodities futures contracts for Maine potatoes), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). Embracing this expansive view of the scope of "in restraint of trade or commerce" within § 1 of the Sherman Act, we decline to adopt the district court's narrow holding that the antitrust laws are inapplicable because what is being sold are shares of stock of Federated. *Cf. Bozant v. Bank of New York*, 156 F.2d 787, 789–90 (2d Cir.1946) (L. Hand, J.) (finding that bank was a producer of "goods," i.e. stocks, bonds and commercial paper). That there are few antitrust cases involving sales of stock comports with our belief that such claims are properly brought under the securities and not antitrust laws; it does not establish that the antitrust laws are inapplicable because stock may not be categorized as a manufactured good.

## II  *Implied Revocation of the Antitrust Laws*

As an alternative ground for dismissing the instant complaint, the district court held that the Sherman Act's application to cases of market manipulation was impliedly revoked by more specific provisions in the Williams Act. It adopted the Seventh Circuit's conclusion in *Schaefer*, 509 F.2d at 1299–1300, that there is an irreconcilable inconsistency between the single damages provided by the securities laws and the treble damages provided by the antitrust laws. We explicitly rejected the *Schaefer* rationale in *Strobl*, 768 F.2d at 30, and accordingly need not revisit this ground for implicit revocation of the antitrust laws.

### A.  *Doctrine of Implied Revocation*

█  Nevertheless, the doctrine of implied revocation provides a firm foundation for the district court's dismissal. Although the Williams Act, 82 Stat. 454, *codified at* 15 U.S.C. §§ 78m(d)-(e) & 78n(d)-(f) (1988), does not foreclose all antitrust claims arising in the context of market manipulation, we hold that the Sherman Act is implicitly repealed in the circumstances of the case at bar.

The three seminal Supreme Court cases, *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and *United States v. National Association of Securities Dealers*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), establish the rules for implied revocation of the antitrust laws in the field of securities regulation. To begin with, repeal "by implication is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon*, 422 U.S. at 682, 95 S.Ct. at 2611 (quoting *Philadelphia Nat'l Bank*, 374 U.S. at 350–51, 83 S.Ct. at 1734–35). The holdings in *Silver* and *Gordon* teach that antitrust laws do not come into play when they would prohibit an action that a regulatory scheme permits. *Strobl*, 768 F.2d at 27.

In *Silver*, the New York Stock Exchange denied its members' request for direct telephone connections to nonmembers located in Texas. Because the Securities and Exchange Commission (SEC) lacked authority to supervise the Stock Exchange's rules on direct telephone connections the antitrust laws were not revoked by implication. The holding in *Silver* was expressly limited to cases involving Stock Exchange rules and orders that lay outside the jurisdiction of the SEC, leaving open the possibility of implied revocation in other contexts. *See* 373 U.S. at 358 n. 12, 360, 83 S.Ct. at 1257 n. 12, 1258. In *Gordon*, the Court examined the other context expressly left open in *Silver*. There the New York Stock Exchange ruling in dispute—establishing a system of fixed commission rates—was subject to regulation and approval by the SEC under § 19(b) of the Securities Ex-

change Act of 1934 (1934 Act), 15 U.S.C. § 78s(b) (1988). 422 U.S. at 685, 95 S.Ct. at 2612. In *Gordon* the elements of implied repeal were met because allowing the antitrust laws to play a role in the area of commission rates would unduly interfere with the operation of the securities law.

Further, in *National Association of Securities Dealers*, implicit revocation with respect to certain sales and distribution restrictions used in marketing securities of mutual funds was found. The Supreme Court held that because the SEC had the power to authorize such restrictions on sales and distributions under § 22(f) of the Investment Company Act of 1940, 15 U.S.C. § 80a–22(f) (1988), and because there was "no way to reconcile the Commission's power to authorize these restrictions with the competing mandate of the antitrust laws," there was an implied repeal of the latter laws. 422 U.S. at 722, 95 S.Ct. at 2444. By way of contrast, in *Strobl* we found there was no inconsistency between the Commodity Exchange Act and the Sherman Act because price manipulation—a practice forbidden by the Sherman Act—was also forbidden by the Commodity Exchange Act. 768 F.2d at 27. As a consequence of the above decisions, repeal by implication may only be found where there is a conflict between the provisions of the antitrust and securities laws.

### B. *Implied Revocation in this Case*

#### 1. *Purposes of the Williams Act*

In the case at bar, the antitrust laws are inconsistent with the Williams Act and implied repeal is necessary to make the securities regulations work. *See Silver*, 373 U.S. at 357, 83 S.Ct. at 1257. In 1968 Congress enacted the Williams Act, which amended sections of the 1934 Act, to "close a significant gap in investor protection under the Federal securities laws by requiring the disclosure of pertinent information to stockholders when persons seek to obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities." 113 Cong.Rec. 854 (1967) (quoted in *Piper v. Chris–Craft Indus. Inc.*, 430 U.S.

1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977)). Its purpose "is to insure that public shareholders who are confronted by a cash tender offer ... will not be required to respond without adequate information...." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).

Declining to pass legislation that benefitted either bidders or incumbent management, Congress instead adopted a "policy of evenhandedness." *Chris–Craft*, 430 U.S. at 31, 97 S.Ct. at 944. The twin aims of the Williams Act were therefore protection of target shareholders and neutrality as between bidders and target companies. *See* Johnson & Millon, *Misreading the Williams Act*, 87 Mich.L.Rev. 1862, 1895–96 (1989). These goals are to be reached through the disclosure requirements mandated under the Williams Act.

Section 14(d) of the statute grants to the SEC the authority to prescribe substantive rules and regulations setting forth information necessary to protect shareholders of target companies. Under § 14(d), a bidder for a public company whose shares are registered with the SEC under the 1934 Act must file a Schedule 14D–1 with the SEC on the date of the commencement of the tender offer. The disclosure requirements of Schedule 14D–1 and the language of the Williams Act contemplate agreements between bidders. Item 7 of Schedule 14D–1 reads:

> *Contracts, Arrangements, Understandings or Relationships with Respect to the Subject Company's Securities.* Describe any contract, arrangement, understanding or relationship ... between the bidder ... and any person with respect to any securities of the subject company (including ... joint ventures ...), naming the persons with whom such contracts, arrangements, understandings or relationships have been entered into....

17 C.F.R. § 240.14d–100 (1989).

Further, § 14(d)(2) of the 1934 Act, 15 U.S.C. § 78n(d)(2) (1988), reads:

> When two or more persons act as a partnership, limited partnership, syndicate,

or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for purposes of this subsection.

Because disclosure is the means by which Congress sought to protect target shareholders, the prior provisions make clear that once information regarding an agreement between rival bidders has been revealed in a filing, the target company's shareholders have received the protection Congress and the SEC designed for them and there has been compliance with the Williams Act.

■ Recognizing the logical implication of the word "group" as anticipating the sort of bid made by Macy's and Campeau, appellant contends that these provisions authorize only those agreements made by bidders prior to engaging in a contest for control of a target company, not agreements made by rival bidders during the bidding process such as was the case here. We are unable to agree with this view because neither the Williams Act nor the SEC regulations make a distinction between joint bids made by parties prior to entering a battle for control of the target and those made by parties who are rival bidders at the outset. We would think the SEC justified in deeming an agreement such as that alleged here to be a joint bid and to require the parties to file amendments to their existing filings under Schedule 14D–1, *see* 17 C.F.R. § 240.14d–3(b) (1990). Further, joint bids are not that uncommon. For example, in 1984 Reliance Financial Services Corporation and Fisher Brothers jointly offered to purchase Walt Disney Productions, and Waste Management, Inc. and Genstar made a joint offer for SCA Services, Inc. *See* 1 M. Lipton and E. Steinberger, *Takeovers and Freezeouts*, § 1.08(4) (1989 ed.).

### 2. *Disclosure Under the Williams Act*

Congress drafted the Williams Act with language allowing joint bids for target companies and the SEC promulgated a regulation—Regulation 14D–1, 17 C.F.R. §§ 240.14d–1 through 240.14d–101 (1990)—that requires disclosure of agreements between bidders. In order for § 14(d) and the accompanying SEC regulation to function as intended, such agreements cannot be subject to suit under the antitrust laws; to permit such a suit would foster a direct conflict between the securities and antitrust laws. *Silver*, 373 U.S. at 357, 83 S.Ct. at 1257; *see also Strobl*, 768 F.2d at 27 ("antitrust laws may not apply when such laws would prohibit an action that a regulatory scheme might allow"). We cannot presume that Congress has allowed competing bidders to make a joint bid under the Williams Act and the SEC's regulations and taken that right away by authorizing suit against such joint bidders under the antitrust laws.

The SEC also has the power to regulate tender offers under the antifraud provision of the same statute. Among the sections added to the 1934 Act by the Williams Act was § 14(e), 15 U.S.C. § 78n(e) (1988), which made it "unlawful for any person ... to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer...." Bidders are prohibited under this section from engaging in fraudulent acts involving misrepresentation or nondisclosure, and though the word "manipulation" appears in § 14(e) it has not been viewed as relating to making or withdrawing bids. *See Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985). Congress aimed to redress fraudulent practices by means of disclosure, and "[n]owhere in the legislative history is there the slightest suggestion that § 14(e) serves any purpose other than disclosure, or that the term 'manipulative' should be read as an invitation to the courts to oversee the substantive fairness of tender offers." *Id.* at 11–12, 105 S.Ct. at 2464; *see also id.* at 9 n. 8, 105 S.Ct. at 2463 n. 8 ("'The process through which Congress developed the Williams Act also suggests a calculated reliance on disclosure, rather than court-imposed principles of 'fairness' or 'artificiality,' as the preferred method of market regulation.").

■] Finnegan asserts that the SEC is without authority to regulate agreements between rival bidders such as Macy's and Campeau because the SEC is only empowered to regulate in the area of disclosure. This assertion misperceives the scope of that federal agency's power. The last sentence in § 14(e) states:

> The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

In adding this sentence in 1970, "Congress ... provided a mechanism for defining and guarding against those acts and practices which involve material misrepresentation or nondisclosure." *Schreiber*, 472 U.S. at 11 n. 11, 105 S.Ct. at 2464 n. 11. Under its authority the SEC has promulgated procedural rules providing, *inter alia*, additional withdrawal rights, *see* 17 C.F.R. § 240.14d-7 (1989), and that an offer be held open to "all security holders of the class of securities subject to the tender offer," 17 C.F.R. § 240.14d-10(a)(1) (1989) (All Holders Rule); *Polaroid Corp. v. Disney*, 862 F.2d 987, 994 (3d Cir.1988) (upholding the SEC's authority to promulgate the All Holders Rule notwithstanding that it is only tangentially related to ensuring complete disclosure). *See CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 79–80, 107 S.Ct. 1637, 1644–45, 95 L.Ed.2d 67 (1987).

The SEC is able to regulate agreements between bidders by virtue of its authority to define fraudulent, deceptive or manipulative practices and to prescribe means to prevent such practices. 15 U.S.C. § 78n(e). Through its power to prohibit fraudulent activity, the SEC has supervisory authority over the submission of joint bids or other agreements in the corporate auction contest. *Cf. National Ass'n of Sec. Dealers*, 422 U.S. at 726–28, 95 S.Ct. at 2446–47 (SEC election not to initiate restrictive regulations constituted administrative oversight). Although such agreements are not defined as deceptive practices under the regulations, the fact that they must be disclosed under Regulation 14D–1 clearly implies that the SEC contemplated their existence. That the SEC has chosen not to prohibit agreements between rival bidders as fraudulent or manipulative practices once shareholders are properly informed of them, does not reduce the SEC's supervisory authority over such agreements.

Consequently, because the SEC has the power to regulate bidders' agreements under § 14(e), *cf. Gordon*, 422 U.S. at 685, 95 S.Ct. at 2598; *National Ass'n of Sec. Dealers*, 422 U.S. at 726–27, 95 S.Ct. at 2446, and has implicitly authorized them by requiring their disclosure under Schedule 14D–1 as part of a takeover battle, *cf. Silver*, 373 U.S. at 357, 83 S.Ct. at 1257; *Strobl*, 768 F.2d at 27, to permit an antitrust suit to lie against joint takeover bidders would conflict with the proper functioning of the securities laws.

## 3. Neutrality Under the Williams Act

A further though lesser conflict may also be seen between the antitrust laws and the Williams Act. It surfaces in the legislative policy of maintaining neutrality among bidders, shareholders and target company management. Congress realized "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." S.Rep. No. 550, 90th Cong., 1st Sess. 3–4 (1967). If the antitrust laws were applied to prohibit agreements between rival bidders, it would discourage potential bidders from making a tender offer. Once more than one bidder entered the fray for control of a target company, the shareholders of that company could use the antitrust laws to force a fight to the last ditch, notwithstanding that the bidders could agree on terms more advantageous to themselves. Certainly this would discourage takeover activity—an end Congress sought to avoid in enacting the Williams Act. *See* Statement of Senator Williams, 113 Cong.Rec. 854–55 (1967) (the Williams Act seeks "to balance the scales equally to protect the legitimate interests of the corporation, management, and shareholders without unduly impeding cash takeover bids").

**832**

This conflict has been recognized in cases discussing implied preemption of state takeover laws by the Williams Act. *See, e.g., CTS*, 481 U.S. 69, 107 S.Ct. 1637; *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). In *MITE*, a plurality of the Supreme Court held that the Illinois Take–Over Act was preempted by the Williams Act because some of its provisions favored target company management in takeover contests, and therefore upset the Act's objective of even-handedness between the target company and bidders. 457 U.S. at 630–40, 102 S.Ct. at 2634–40. A different result was reached in *CTS*, where the Court stated that even under the broad interpretation of the Act adopted by the plurality in *MITE*, an Indiana takeover statute was not preempted because it did not favor incumbent management over hostile bidders in contests for control. 481 U.S. at 80–87, 107 S.Ct. at 1645–1648.

Here, the application of the antitrust laws would upset the balance among incumbent management, target shareholders and bidders which Congress sought to achieve through the Williams Act. Allowing antitrust suits to rule out agreements between rival bidders would give target shareholders undue advantage in the takeover context and discourage such activity. Fewer takeover attempts ultimately favor incumbent management whose entrenched position is thereby less subject to challenge. Hence, reasoning by analogy from the logic of *MITE* and *CTS*, the antitrust laws are rendered inapplicable by the Williams Act in the instant case.

### CONCLUSION

Accordingly, for the reasons stated above, the judgment dismissing appellant's complaint is affirmed.