**PENNSYLVANIA AVENUE FUNDS, Plaintiff,**

v.

**Edward J. BOREY, et al., Defendants.**

**Case No. C06–1737RAJ.**

United States District Court,
W.D. Washington,
at Seattle.

Feb. 21, 2008.

Jeffrey R. Krinsk, Mark L. Knutson, William R. Restis, Finkelstein & Krinsk LLP, San Diego, CA, Eric D. Lowney, Richard Adam Smith, Smith & Lowney PLLC, Seattle, WA, for Plaintiff.

Gabriel Z. Reynoso, James N. Kramer, Michael D. Torpey, Orrick, Herrington & Sutcliffe, San Francisco, CA, Louis David Peterson, Michael Ramsey Scott, Hillis, Clark, Martin & Peterson, Barry M. Kaplan, Wilson, Sonsini, Goodrich & Rosati, Jeremy E. Roller, Yarmuth Wilsdon Calfo, Seattle, WA, David H. Evans, James H. Hulme, Joshua Fowkes, Arent Fox, Washington, DC, Bahram Seyedin–Noor, David Joel Berger, Jonathan M. Jacobson, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Scott A. Sher, Wilson, Sonsini, Goodrich & Rosati, Washington, DC, Aravind Swaminathan, United States Attorney's Office, Seattle, WA, for Defendants.

## ORDER

RICHARD A. JONES, District Judge.

## I. INTRODUCTION

This matter comes before the court on a motion to dismiss Plaintiff's antitrust claim (Dkt. # 83). The court has reviewed the motion together with all documents filed in support and in opposition, and has heard oral argument. For the reasons set forth herein, the court GRANTS the motion and dismisses Plaintiff's antitrust claim with prejudice.

---

1. Plaintiff relies upon its first amended complaint (Dkt. # 52). The court will use bare

## II. BACKGROUND

This action arises in the wake of a merger that extinguished WatchGuard Technologies Incorporated ("WatchGuard") as a publicly traded corporation. Plaintiff Pennsylvania Avenue Funds owned shares of WatchGuard, and seeks to represent a class of all persons who held WatchGuard stock at the time of the merger. The court has described the merger in prior orders, and declines to repeat that discussion here. For purposes of this motion, it suffices to focus on the actions of two groups of Defendants, to whom the court will refer collectively as "FP" and "Vector." In describing their actions, the court relies solely on Plaintiff's operative complaint [1] ("Complaint").

At some point in the latter half of 2005, WatchGuard's board of directors determined that they should either sell the company or merge with another company. ¶ 32 ("By the end of 2005, the Directors came to believe that it was an opportune time to sell WatchGuard and solicit offers for that purpose."), ¶ 35. This led to an acquisition process in which numerous potential purchasers expressed interest in WatchGuard. The Complaint focuses on only a few of those suitors, (e.g., ¶¶ 34, 35, 36, 47, 50), but Plaintiff admitted at oral argument that as many as 50 suitors expressed some level of interest, consistent with Defendant's statements that 18 private equity funds and 17 strategic partners participated in the process. Defs.' Mot. at 1.

Among these suitors, Vector and FP offered formal acquisition bids. At the outset of the "auction" of WatchGuard, FP and Vector were competitors. Each ex-

"¶" symbols when citing this pleading.

pressed interest in acquiring the company, and each made more than one formal bid, starting as high as $5.10 per share. ¶¶ 36, 46, 47, 50. As of June 26, 2006, FP had made a $4.60 per share bid, and Vector had made a $4.65 per share bid. ¶ 50.

The critical allegation for purposes of this motion is that, on June 26, 2006, Vector and FP "entered into a contract, combination or conspiracy to artificially fix the price, refrain from bidding, or rig the tender offer bids for WatchGuard shares." ¶ 54. Plaintiff claims that Vector agreed to stop pursuing WatchGuard, and stand aside while FP made a lower bid. *Id.* FP later lowered its bid to $4.25 per share, WatchGuard's board accepted the bid on July 25, 2006, and WatchGuard's shareholders voted in favor of the merger, which closed in October 2006. ¶¶ 56, 69. On August 16, 2006, Vector announced an agreement to fund half of FP's acquisition of WatchGuard in exchange for a 50% interest in WatchGuard after the merger. ¶ 65. WatchGuard's directors disclosed the agreement again in their September 1, 2006 proxy statement soliciting votes in favor of the merger.

### III. DISCUSSION

Plaintiff claims that the agreement of FP and Vector to combine for purposes of acquiring WatchGuard was anticompetitive conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Vector and FP move to dismiss the antitrust claim under Fed.R.Civ.P. 12(b)(6).

### A. Standard of Review on a Motion to Dismiss

Where a defendant alleges that a plaintiff's factual allegations are insufficient to state a claim, the court reviews the allegations under the liberal pleading standard of Fed.R.Civ.P. 8(a).[2] The court construes all allegations in the light most favorable to the non-moving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 946 (9th Cir.2005). The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir.1998). A complaint need not contain detailed factual allegations, but it must provide the grounds for entitlement to relief and not merely a "formulaic recitation" of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

Alternatively, where a defendant successfully challenges a plaintiff's legal theory, rather than the sufficiency of the plaintiff's allegations, the court must also dismiss the complaint. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990) ("Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.").

The court's review of the record on a Rule 12(b)(6) motion is generally limited to the complaint itself. *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir.2006). The court may, however, consider evidence on which the complaint necessarily relies as long as "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Id.* The court may also rely on facts subject to judicial notice.

---

**2.** No party contends that a heightened pleading standard governs Plaintiff's antitrust claim.

*United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003). Finally, the court may consider a plaintiff's clarifications in briefing and at oral argument. *Pegram v. Herdrich,* 530 U.S. 211, 230 n. 10, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (citing, *inter alia, Alicke v. MCI Commc'ns Corp.,* 111 F.3d 909, 911 (D.C.Cir.1997), in which court relied on statements in oral argument to clarify complaint).

**B. The Court Declines to Decide Whether Securities Law Precludes the Application of Antitrust Law in This Case.**

 Before considering the sufficiency of Plaintiff's antitrust claim, the court addresses Defendants' contention that securities laws preclude application of antitrust law. In cases like this one, where antitrust and securities regulation may overlap, courts have developed an inquiry to evaluate the extent of the overlap. Where a court finds a "clear repugnancy" between the application of securities law and antitrust law to the defendants' conduct, securities law prevails, and precludes the application of antitrust statutes. *Credit Suisse Securities (USA) LLC v. Billing,* —— U.S. ——, 127 S.Ct. 2383, 2392, 168 L.Ed.2d 145 (2007). To determine whether there is a clear repugnancy between the two legal regimes, there are four critical factors:

(1) an area of conduct squarely within the heartland of securities regulations; (2) clear and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes.

*Id.* at 2397. In shorthand form, the four factors test for SEC "legal regulatory authority," "exercise of that authority," the existence of a serious conflict between antitrust and securities regimes, and "heartland securities activity." *Id.* at 2393.

The Defendants' attempt to invoke *Credit Suisse* preclusion founders on their inability to show that the SEC has regulatory power over the conduct of FP and Vector. All parties concede that the SEC has sweeping power to regulate *disclosure* of bidding agreements like the one between FP and Vector. *See, e.g.,* 17 C.F.R. § 240.14d–100 (establishing form for tender offer statement); 17 C.F.R. § 240.14a–101 (establishing form for proxy statement). No party, however, has put forth a compelling argument that the SEC has authority to prevent bidders like FP and Vector from joining forces. If the SEC's power is limited to requiring disclosure, then the agency's exercise of that power does not conflict with antitrust law, under which disclosure is neither a remedy for anticompetitive conduct nor a defense to the imposition of liability.

Defendants point to no source of authority that permits the SEC to substantively regulate bidding combinations like the one before the court. The Williams Act (15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f))[3], which governs tender offers for a significant portion of a company's securities, applies not only to individual bidders, but to "persons act[ing] as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78n(d)(2). Although the Act recognizes that bidders might join forces, the best

---

**3.** In a separate motion to dismiss Plaintiff's federal securities claims, Vector argued that the Williams Act has no application to the WatchGuard merger. If Vector were right, a question that the court did not resolve in granting that motion, it would only strengthen Plaintiff's assertion that securities laws do not reach the anticompetitive conduct of FP and Vector.

indication of a power to regulate their conduct is an authorization to issue rules proscribing "fraudulent, deceptive, or manipulative acts or practices" in connection with tender offers. 15 U.S.C. § 78n(e). This provision, however, has been interpreted to authorize only disclosure regulations:

> Nowhere in the legislative history is there the slightest suggestion that § 14(e) serves any purpose other than disclosure, or that the term "manipulative" should be read as an invitation to the courts to oversee the substantive fairness of tender offers; the quality of any offer is a matter for the marketplace.

*Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 11, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985). The Supreme Court has interpreted the Williams Act to let the marketplace, not the SEC, govern the substantive fairness of a tender offer. Anticompetitive conduct in the marketplace is the realm of antitrust.

Rather than cite a specific source of preclusive regulatory authority, Defendants rely upon *Finnegan v. Campeau Corp.,* 915 F.2d 824 (2d Cir.1990), in which the Second Circuit found preclusion of antitrust law in circumstances similar to the case at bar. In *Finnegan,* two rival bidders initially drove up the price for the target corporation. *Id.* at 826. After realizing that "raising the price of the target company was economically disadvantageous to them," they agreed that one company would withdraw its latest bid in exchange for a cash payment and two divisions of the target company. *Id.* Just as in this case, two rival bidders joined forces in a manner that deprived the shareholders of the target company of a potentially higher acquisition price.

Despite the price-depressing effect of the acquirors' conduct, the *Finnegan* court

concluded that securities law precluded the application of antitrust law. The court noted that the Williams Act contemplates concerted action by groups of acquirors. *Id.* at 829–30. It also noted that Congress empowered the SEC to "regulate agreements between bidders by virtue of its authority to define fraudulent, deceptive or manipulative practices and to prescribe means to prevent such practices." *Id.* at 830. To support its finding of substantive regulatory authority, the court pointed to regulations promulgated under the Williams Act governing procedures for tender offers. *Id.* at 831. Although the cited regulations did not impact the anticompetitive conduct alleged in *Finnegan,* the court nonetheless concluded that because the SEC had the power to regulate "bidders' agreements," and had "implicitly authorized them by requiring their disclosure," antitrust suits aimed at concerted action by acquirors would "conflict with the proper functioning of the securities laws." *Id.*

Several considerations prevent this court from reaching the same conclusion as the *Finnegan* court. *Finnegan* came almost two decades before the Supreme Court's decision in *Credit Suisse.* Although nothing in *Credit Suisse* suggests a sea change in preclusion analysis, the Court emphasized that preclusion depends on showing SEC regulatory authority and enforcement over "all of the activities" that a plaintiff challenges as anticompetitive. 127 S.Ct. at 2392–93. In *Credit Suisse,* which examined "anticompetitive charges" levied on participants in initial public offerings of stock, *id.* at 2389, the Court pointed to SEC regulations on "virtually every aspect of the practices in which [the defendants] engaged." *Id.* at 2392. The Court looked not only at SEC regulations that "defined in detail" what conduct was permissible, but at actions by the SEC and

private litigants to enforce those regulations. *Id.* at 2393. The *Finnegan* court provides no similar analysis of SEC regulatory authority or enforcement over efforts by competing bidders to join forces in a contest for corporate control. More importantly, however, Defendants have not convinced the court either that the SEC possesses authority over the anticompetitive conduct that Plaintiff alleges, or that it has exercised that authority. For that reason, the court declines to decide whether securities law precludes Plaintiff's antitrust claim.

### C. Plaintiffs Have Not Stated a Claim Under Section 1 of the Sherman Act.

■ The court now turns to an application of antitrust law to Plaintiff's allegations. Section 1 of the Sherman Act literally prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce...." 15 U.S.C. § 1. Courts apply the literal restriction, however, only to a narrow category of conduct that is *per se* unlawful. *Texaco Inc. v. Dagher,* 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006). *Per se* liability applies to "agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Id.* (citation and internal quotation omitted). Courts presumptively do not apply the *per se* rule, instead applying a "rule of reason" analysis that requires an examination of the economic effect of the challenged conduct and the market in which it occurs. *Id.*

Before conducting its analysis, the court emphasizes that it accepts for purposes of this motion that Vector and FP agreed to fix the merger price for FP, and that the result is that WatchGuard shareholders received less money than if Vector and FP

had continued to compete. Plaintiff has adequately alleged "price fixing in a literal sense," and the court's task is to determine whether Defendants engaged in "price fixing in the antitrust sense." *Texaco,* 547 U.S. at 6, 126 S.Ct. 1276.

#### 1. Plaintiff Has Not Alleged Conduct that is Per Se Unlawful.

Analysis of Defendants' agreement to acquire WatchGuard under the *per se* rule is presumptively inappropriate. *Nova Designs, Inc. v. Scuba Retailers Ass'n,* 202 F.3d 1088, 1091 (9th Cir.2000). When applying the *per se* rule, a court ignores the "reasonableness of [the challenged] restraint in light of the real market forces at work" in the case before it, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* — U.S. ——, 127 S.Ct. 2705, 2713, 168 L.Ed.2d 623 (2007), and declares the challenged practice unlawful. Because application of the *per se* rule means that the court will not engage in nuanced analysis of the defendants' anticompetitive conduct in context, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue...." *Id.* at 2713.

Plaintiff stands at a disadvantage in invoking the *per se* rule, because no court has applied the rule to a price-fixing agreement in a contest for corporate control. Indeed, neither party cites authority in which a court has considered the issue. This court notes, however, that in at least two cases the parties have cited, competitors for corporate control agreed to cease competition in exchange for economic considerations. The court has already examined the Second Circuit's decision in *Finnegan,* in which two competitors agreed to stop their escalating bids and divide the target company between them. 915 F.2d at 826. In another case, rival bidders "effectively ended the bidding" for the tar-

get corporation by agreeing to a "carve-up" of the target. *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 726 (Del.Ch. 1999). These cases demonstrate that the price fixing practice that Plaintiff challenges is not uncommon, and yet it appears that no court has considered whether it is *per se* unlawful, much less applied a *per se* rule.

■ Where no precedent mandates a *per se* analysis, the court must determine, "in the first instance, the economic effects" of price fixing among rivals for control of a target corporation, to determine whether the practice is *per se* unlawful. *Leegin Creative*, 127 S.Ct. at 2714. The court cannot consider the particular effects of Defendants' conduct in the case before it, but must instead consider whether conduct like the Defendants', *in general*, has "manifestly anticompetitive effects" and "lack[s] any redeeming virtue." *Id.* at 2713. So long as there are "plausible arguments that a practice enhances overall efficiency and makes markets more competitive," application of the *per se* rule is not appropriate. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir.2003). *Per se* treatment is appropriate only when the challenged practice "facially appears to be one that would always or almost always tend to restrict competition and decrease output...." *Broad. Music, Inc. v. Columbia Broad. System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

■ Price fixing among rival bidders in a contest for corporate control is not, in general, anticompetitive. Plaintiff admits as much by agreeing that when potential rivals agree to join forces *before* entering a contest for corporate control, they have acted lawfully. Pltf.'s Opp'n at 8 (describing this practice as a "joint bid"); ¶ 73 ("Plaintiff is not alleging joint bidding or other joint venture ... that would be permissible under the antitrust laws.").[4] Putting aside Plaintiff's admission, it is apparent that bidders who join forces can promote rather than suppress competition. For example, in a corporate auction involving numerous well-heeled bidders, less wealthy bidders cannot compete. By joining forces, and thus combining resources, poorer contestants can gain access to the contest, thus increasing competition. Similarly, where the acquisition of a corporate asset imposes risks that are too great for a single potential acquiror to bear, bidders who join forces can spread risk between themselves, thus promoting competition. In either scenario, a competitor who initially enters a control contest alone might well join forces with a rival when escalating prices exceed its resources or risk tolerance.

Price agreements between competitors in a corporate control context are not *per se* illegal. The examples above show that the practice is not invariably anticompetitive. Plaintiff alleges that the circumstances of this case are quite different than the examples above, but this is irrelevant in determining whether the *per se* rule applies. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103–04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."). Indeed, Plaintiff's effort to show that the agreement between Vector and FP was anticompetitive in the context of

---

4. The parties debate whether the agreement between Vector and FP was a "joint bid" or an example of "bid rigging." The court declines to use either label, because the question before the court is whether the agreement between FP and Vector violates the Sherman Act. Semantics play no part in resolving this question.

the contest for control of WatchGuard only emphasizes that the court must apply a particularized rule of reason analysis, rather than the *per se* rule. *Broad. Music,* 441 U.S. at 19 n. 33, 99 S.Ct. 1551.

### 2. Plaintiff's Allegations Do Not Withstand a Rule of Reason Analysis.

■ Under the rule of reason, a plaintiff asserting a Section 1 claim must, at the threshold, "allege that the defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1044 (9th Cir.2008). The plaintiff must allege both the existence of a relevant market and "that the defendant has power within that market." *Id.* A plaintiff can prove market power by direct or circumstantial evidence. *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995). In either case, the plaintiff must show that the defendants control enough of the market that their anticompetitive conduct actually injures competitors or consumers. *Id.; see also id.* at 1444 (holding that the market power requirement applies equally to claims under § 1 and § 2 of the Sherman Act).

■ Plaintiff's description of the alleged relevant market as "the market for corporate control of WatchGuard and other technology companies," ¶ 76, is fatal to its Sherman Act claim. There is no allegation from which the court could reasonably infer that Vector and FP have power in this market. Plaintiff alleges that in 2006 alone, "nearly $159 billion has poured into private equity funds." ¶ 71. Plaintiff offers no allegations from which the court could infer that the combined resources of FP and Vector are more than a minuscule fraction of this market.

Construing the Complaint in the light most favorable to Plaintiff, Plaintiff may be alleging that the relevant market is the "market for corporate control of WatchGuard" alone. ¶ 142. Assuming for the sake of argument that such a narrow definition of a relevant market is appropriate, *cf. Newcal,* 513 F.3d at 1045 (discussing when it is "legally permissible to premise antitrust allegations on a submarket"), Plaintiff still has failed to show that FP and Vector have market power. Plaintiff errs in focusing on the conclusion of the contest for control of WatchGuard, in which Vector and FP were the only bidders remaining. Vector and FP had an apparent stranglehold on this submarket, to be sure, but only because dozens of other suitors who expressed interest in WatchGuard refused to make bids. There is no inference that Vector and FP had market power among these suitors. There is also no inference that these potential acquirors declined to enter the fray because of the anticompetitive conduct of Vector and FP. Instead, the inference is that most suitors refused to bid because WatchGuard was not an attractive asset. The result was a contest for corporate control in which it appeared that there were only two bidders, but the appearance is a mirage. Any acquiror who believed that WatchGuard was worth more than FP's bid could have made a topping bid. The agreement between FP and Vector would have had no effect on such a bid. Moreover, had WatchGuard's shareholders believed that the FP bid was too low, they retained power to reject the merger by voting it down. In short, the court cannot infer that Vector and FP had market power even in the contest for control of WatchGuard. The illusion of market power arose not from Defendants' anticompetitive conduct, but from the lack of market interest in WatchGuard.

The court must dismiss Plaintiff's antitrust claim, because Plaintiff has not al-

leged the existence of a relevant market in which FP and Vector had market power.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS the motion before it (Dkt. # 83), and dismisses Plaintiff's antitrust claim. The court directs the clerk to remove the joinder in the instant motion (Dkt. # 87) from the court's motions calendar. The court finds that no amendment would cure the defects that led the court to dismiss Plaintiff's antitrust claim, and therefore dismisses the claim with prejudice.

As this order resolves the last of the three motions to dismiss pending in this matter, the court now addresses the extent of Plaintiff's leave to amend its complaint. As to Plaintiff's claims for breach of fiduciary duty, Plaintiff may amend its allegations if it can cure the shortcomings the court identified in its order dismissing those claims (Dkt. # 108). As to Plaintiff's claims under federal securities law, most cannot be salvaged by amended pleadings, for the reasons stated in that order (Dkt. # 107). The sole exception is Plaintiff's claim for insider trading under Rule 10b–5 (17 C.F.R. §§ 240.10b–5, 240.10b–5–1, 240.10b–5–2) based on Vector's acquisition of WatchGuard shares prior to March 23, 2006. Plaintiff may amend its complaint to provide the specificity required under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, to sustain an insider trading claim. Finally, as noted above, no amendment is appropriate as to Plaintiff's antitrust claim.

Plaintiff shall provide an amended complaint no later than March 7, 2008. The amended complaint shall be in "redlined" format or in another format that permits the court to easily identify new or modified allegations, as well as allegations that have been deleted. Defendants shall neither answer the amended complaint nor move to dismiss it until further order of the court.